# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3942

_____

United States of America,          *
                                    *
Plaintiff - Appellee,               *
                                    *
v.                                  *
                                    *
Earnest Washington,                 *
                                    *
Defendant - Appellant.              *


_____

No. 01-2351

_____

Appeals from the United States
District Court for the
Eastern District of Missouri.

United States of America,          *
                                    *
Plaintiff - Appellee,               *
                                    *
v.                                  *
                                    *
Wendell E. Fortenberry,             *
                                    *
Defendant - Appellant.              *

_____

Submitted:  April 18, 2002

Filed:  January 31, 2003

_____

Before BOWMAN, LAY, and JOHN R. GIBSON, Circuit Judges.
_____

JOHN R. GIBSON, Circuit Judge.

Appellants Earnest Washington and Wendell Fortenberry were convicted in the district court[1] after a seven-day jury trial. Washington was convicted of two counts involving conspiracy to distribute heroin under 21 U.S.C. § 846 and conspiracy to commit murder for hire under 18 U.S.C. § 1958(a). Fortenberry was convicted of three counts, including conspiracy to distribute heroin, conspiracy to commit murder for hire, and murder for hire. They bring separate appeals which we have consolidated. We first address the challenge to the sufficiency of the evidence and then consider individual arguments by Washington and Fortenberry. We affirm both convictions and sentences.

We state the facts in the light most favorable to the jury's verdict. On the morning of May 6, 1998, the St. Louis police responded to a 911 phone call at the 4900 block of Geraldine, where they discovered the dead bodies of Gerondrick Jackson and Anthony Smith in the backseat and trunk of a 1998 Ford Contour. After retrieving evidence from the car, the police went to the house at 5071 Durant, where gunshots had been reported earlier in the morning. Once inside the house, police technician Michael Priest collected five bullets from the scene, a Tommy Hilfiger baseball cap from the yard, a black leather coat, a .9 mm handgun, blood swabs from inside the residence, beer cans, and a torn counterfeit $100.00 bill. Fingerprints obtained from the beer cans at 5071 Durant were found to match those of Wendell Fortenberry. Ballistics expert Frank Stubits stated that two of the bullets recovered from the victims' bodies and one bullet recovered at the Durant residence were fired

_____

[1]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

from the same nine millimeter gun. Stubits also testified that other bullets recovered from the victims and the house indicated that two additional weapons had been used.

Over a year later, the police received information linking Arnold Young, Tom Manley, Wendell Fortenberry, and Earnest Washington to the murders of Jackson and Smith. In April 1999, Special Agent Tom Fisher of the Drug Enforcement Administration (DEA) stopped two men on a routine drug interdiction at Lambert airport in St. Louis. These men were each carrying a quantity of heroin in excess of one-half kilogram and subsequently cooperated with the DEA investigation. One of these men acknowledged that he sold drugs for Arnold Young's Los Angeles drug organization and described the details of the enterprise. He explained that for some time, Young had been selling heroin to both Anthony Smith and Tom Manley for distribution in St. Louis, Missouri. This informant also told agents that in the course of these transactions, Smith had stolen $30,000.00 worth of heroin from Young. Because of this unpaid debt, Young had discussed with Manley the possibility of killing Smith and making it look as if a rival drug dealer had been responsible. Manley then contacted Wendell Fortenberry and Earnest Washington who agreed to carry out the murder if Young was willing to pay them five ounces of heroin. Manley called Young, who agreed to the price. Manley then told Fortenberry and Washington that Young has assented to the plan.

Manley testified that on May 6, 1998, the morning of the murders, he was paged by Fortenberry who told him that Anthony Smith had been "taken care of." He told Fortenberry that he would get back to him about payment. Manley left his brother's house and contacted Young by phone and let him know that Smith had been killed. Manley testified that Fortenberry paged him again to come over to a house on Palm Avenue. Manley said that he met Fortenberry and gave him two and one-half ounces of heroin at the Palm address. According to Manley, Fortenberry told him that he had shot Smith, Washington had shot Gerondrick Jackson, and Jackson was shot because he "was in the wrong place at the wrong time." Manley then went home and

-3-

contacted Washington, whom he gave two and one-half ounces of heroin. Arnold Young later flew from Los Angeles to St. Louis and reimbursed Manley for this heroin.

On September 30, 1999, Young, Fortenberry, and Washington were charged in a two-count indictment for murder for hire and conspiracy to commit murder for hire in violation of 18 U.S.C. § 1958(a) (2000).[2] A joint jury trial in May 2000 resulted in a hung jury, and the district court declared a mistrial. The government then filed a second superseding indictment on June 15, 2000, charging Young, Fortenberry, and Washington in a three count indictment, adding the count of conspiracy to distribute heroin in violation of 23 U.S.C. § 846 (2000). After a seven-day trial, the jury returned a verdict of guilty for Fortenberry on all three counts. The jury returned a verdict of not guilty for Washington on the murder for hire count, but found him guilty of conspiracy to commit murder for hire and conspiracy to distribute heroin. Fortenberry and Washington were each sentenced by the district court to a term of life imprisonment.[3]

On appeal, Washington claims that there was insufficient evidence to support his convictions for conspiracy to distribute heroin and conspiracy to commit murder

_____

[2]In July of 1999, while serving time for an unrelated cocaine charge, Manley was indicted with Arnold Young and others on a heroin conspiracy charge. He then signed a proffer letter with the government in August of 1999. In exchange for his testimony in the murder for hire case, Manley received immunity from state and federal prosecution for the murders of Anthony Smith and Gerondrick Jackson and a 210-month sentence for his involvement in the heroin drug conspiracy, to run concurrently with the 262-month sentence he was then serving for possession of cocaine base with intent to distribute. The government also agreed to file a Rule 35 motion supporting a 52-month reduction of the 262-month sentence.

[3]Arnold Young was hospitalized and unable to stand trial in either May 2000 or August 2000 and has since died of pancreatic cancer.

for hire.  In addition, Fortenberry argues that their rights under the Sixth Amendment were violated at trial, and Washington claims several trial errors by the district judge, including the admission of prejudicial evidence.  Finally, Fortenberry challenges his sentence, claiming that the district court incorrectly applied an upward adjustment under Sentencing Guideline § 3C1.1 for obstruction of justice.

I.

Washington argues that the evidence presented by the government was insufficient to convict him of conspiracy to distribute heroin and conspiracy to commit murder for hire.[4]  We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict.  United States v. Grimaldo, 214 F.3d 967, 975 (8th Cir. 2000) (citations omitted).  We may reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt.  United States v. Calderin-Rodriguez, 244 F.3d 977, 983 (8th Cir. 2001).

In order to convict Washington of conspiracy to distribute heroin, the government had to prove beyond a reasonable doubt that (1) a conspiracy with an illegal purpose existed, (2) Washington knew about the conspiracy, and (3) he knowingly became part of the conspiracy.  United States v. Ruiz-Estrada, 312 F.3d 393, 402 (8th Cir. 2002).  To prove the existence of a conspiracy, the government

---

[4]Fortenberry adopts and incorporates by reference Washington's argument that the guilty verdicts on the conspiracy to distribute heroin and the conspiracy to commit murder for hire were not supported by the evidence.  Washington's argument addresses the government's evidence for his, and not Fortenberry's, conviction, as Fortenberry provided no record citations for our review.  See Fed. R. App. P. 28(a)(9)(A).  Nevertheless, the evidence designated by Washington is sufficient to convict Fortenberry, too.  Much of it is recited throughout the opinion.

may provide information regarding how long Washington, Fortenberry, and Manley were associated with each other, their established methods of payment, whether or not their transactions were standardized, and their demonstrated level of mutual trust. United States v. Clay, 37 F.3d 338, 341 (7th Cir. 1994). No one factor is dispositive, but "[i]f enough point in the direction of a concrete, interlocked interest beyond the consummation of the individual buy-sell deals themselves, we will not disturb the conclusion reached by the finder of fact that at some point the association blossomed into a cooperative venture." Id. Having put forth testimony that a conspiracy existed, the government need only provide evidence "establishing beyond a reasonable doubt a connection of a defendant with a conspiracy." United States v. DeLuna, 763 F.2d 897, 924 (8th Cir. 1985). Even if this connection is "slight," it is "sufficient to convict him of knowing participation in the conspiracy." Id.

Washington argues that the government was unable to show that a drug conspiracy existed or that he knowingly became part of a conspiracy. However, the government presented several witnesses who provided detailed information about purchases and sales of heroin by Washington in association with Fortenberry and Manley. Cheryl Moore, the mother of Washington's girlfriend, testified that she had purchased heroin from Fortenberry and Washington on three or four occasions, and that Fortenberry told her that Washington got his heroin from Tom Manley. Tom Manley testified that he met with Washington and Fortenberry at Fortenberry's house in the fall of 1997 to discuss selling small amounts of heroin to them. He began by selling them a few grams. Their purchases gradually increased to seven grams of heroin, which they were buying at least once a week. Manley would contact them by mobile phone and meet with them at Fortenberry's house to complete the transactions. Manley testified that he went to Fortenberry's house and observed Fortenberry and Washington preparing heroin for distribution, cutting it with a razor and tying it up in plastic. Manley stated that after the police raided Fortenberry's house in December of 1997, Manley dealt solely with Washington, providing him with small packages

of heroin periodically until May of 1998. This testimony was sufficient for a reasonable jury to convict Washington of conspiracy to distribute heroin.

Washington also claims that there was insufficient evidence to convict him of conspiracy to commit murder for hire under 18 U.S.C. § 1958(a). Washington claims that (1) he was not part of the agreement to commit murder for hire and (2) the heroin he received after the murder did not constitute consideration under the statute.[5]

First, to convict Washington of conspiracy to commit murder for hire, the government had to prove that there was an agreement to achieve an illegal purpose, that Washington knew of this agreement, and that Washington intentionally joined this agreement. United States v. Agofsky, 20 F.3d 866, 870 (8th Cir. 1994). The agreement need not be expressly stated and may be shown entirely through circumstantial evidence of the defendant's actions. United States v. Bass, 121 F.3d 1218, 1220 (8th Cir. 1997). However, "once the government establishes the existence of a conspiracy, only slight evidence is required to link a defendant to the conspiracy. This places a heavy burden on a defendant challenging the sufficiency of the evidence in a conspiracy case." United States v. Jiminez-Perez, 238 F.3d 970, 973 (8th Cir. 2001) (citations omitted).

Several witnesses testified about Washington's knowledge of, agreement to, and intent to participate in the plan to murder Anthony Smith. Tom Manley testified

---

[5]Washington also argues that he cannot be convicted for conspiracy to commit murder for hire while being acquitted for the underlying crime, murder for hire, because the two verdicts are inconsistent. This result is not necessarily inconsistent. Even if it were, this court has rejected this line of argument. See, e.g., United States v. Whatley, 133 F.3d 601, 606 (8th Cir. 1998) ("The only relevant question when reconciling inconsistent verdicts . . . is whether there was enough evidence presented to support the conviction. Inconsistent verdicts are not, on their own, sufficient grounds for reversal or a new trial.")

that he met with both Fortenberry and Washington and told them of Arnold Young's desire to kill Anthony Smith. Fortenberry and Washington then asked Manley to call Young in Los Angeles and ask if they could do the murder for five ounces of heroin. Manley testified that he called Young in Los Angeles and got his approval. Following the murders, Manley met with Fortenberry and Washington individually, giving them each two and one-half ounces of heroin. Manley stated that Young later flew from Los Angeles to St. Louis and reimbursed him for the heroin. Testimony by John Barnett and James Johnson provided further evidence that Washington agreed to the goals of the murder for hire conspiracy.[6] We conclude that the government provided sufficient evidence so that a reasonable jury could find Washington guilty beyond a reasonable doubt of conspiracy to commit murder for hire.

The second issue raised by Washington regarding the murder for hire conspiracy conviction is whether the two and one-half ounces of heroin paid by Manley was sufficient to constitute consideration under 18 U.S.C. § 1958. Section 1958(b)(1) defines consideration as "anything of pecuniary value" or "anything of value in the form of money, a negotiable instrument, a commercial interest, or anything else the primary significance of which is economic advantage." 18 U.S.C. § 1958(b) (2002). The consideration requirement of the statute has been interpreted in the traditional sense of a bargained-for exchange. United States v. Wicklund, 114 F.3d 151, 154 (10th Cir. 1997). Payment need only be a quid pro quo contractual arrangement between the hiring and hired parties. Id. at 153.

---

[6]Johnson, who spent time with Washington at St. Louis County Jail, testified that Washington told him: "Well, they don't really have me because [there] is only one person that can place me there and they interview eight people that was there before the murder happened, can't neither one of those people place me there but Wendell Fortenberry because me and Wendell Fortenberry was the one that murdered the people that was in the house. One of the other people -- one person wasn't supposed to be there so we took care of business on both of them."

Special Agent Thomas Fisher testified that Manley sold heroin at approximately $1,000 an ounce, which would make the two and one-half ounces of heroin given to Washington worth approximately $2,500. (Tr. 4, p. 127). Payment of this amount of heroin, normally associated with distribution and sale, is sufficient to meet the requirements of Section 1958(b) that payment be "a commercial interest" or "anything else the primary significance of which is economic advantage."

## II.

Fortenberry and Washington[7] claim that the government's recommendation that a defense witness be appointed an attorney and the government's refusal to grant two defense witnesses immunity--while granting immunity to its own witness--subverted the judicial fact-finding process and denied Fortenberry and Washington their due process right to a fair trial.

We review claims of constitutional error de novo. United States v. Allen, 247 F.3d 741, 757 (8th Cir. 2001), vacated on other grounds, 122 S.Ct. 2653 (2002).

A prosecutor is not prohibited, upon speaking with a witness and recognizing potentially damaging cross-examination, to inquire about whether a defense witness should be appointed an attorney. See United States v. Boyd, 180 F.3d 967, 983 (8th Cir. 1999) (prosecutor acted properly in bringing to the court's attention the possible need to appoint attorneys for several defense witnesses).

---

[7]Washington adopts and incorporates Fortenberry's argument and case citations pursuant to Fed. R. App. P. 28(i). Since the alleged government misconduct would implicate both Washington and Fortenberry's due process rights and since relief granted based on these arguments would apply to both defendants, we address the convictions of both defendants.

In this case, Fortenberry wanted to call two witnesses, Clarence Conaway and Fred Barnes, to support a theory that Manley had committed the murders by himself. The government informed the court that its investigator had spoken with both Conaway and Barnes and that Conaway's testimony might include incriminating statements about his own drug use and drug relationships. Before the government could finish, the court interrupted and said it would appoint lawyers for both defendants. In fact, Barnes already had an attorney. The government's disclosure and the court's decision to appoint a lawyer for Conaway were not improper.[8]

In addition, Fortenberry and Washington argue that the government's decision to grant immunity to its own witness, Tom Manley, but refusal to grant immunity to defense witnesses Barnes and Conaway, subverted the judicial fact finding process and violated Fortenberry's and Washington's right to due process.

The power to grant immunity is vested in the prosecutor. "The government has broad discretion in its grants of immunity. It is the perogative of the Attorney General and his designees to determine whether a grant of immunity is 'in the public interest' under 18 U.S.C. § 6003." United States v. Hooks, 848 F.2d 785, 802 (7th Cir. 1988) (citations omitted). The defendant must make a "substantial evidentiary showing" that the government intended to distort the judicial fact-finding process before we will depart from the strong tradition of deferring to prosecutorial discretion. Id. at 802. As an appellate court, we will not review a prosecutor's immunization decisions unless the prosecutor's actions amounted to a clear abuse of discretion violating the due process clause. Id. at 799. Examples of actions

_____

[8]Fortenberry and Washington assert that the government's recommendation to appoint the defense witness an attorney is done with the knowledge that the appointed attorney will encourage the witness to invoke his or her Fifth Amendment privilege and not testify on behalf of the defendant. While this may be true, it is the court, and not the government, who ultimately decides whether an attorney is necessary, and later, whether the Fifth Amendment applies.

-10-

infringing on defendant's due process rights include repeated threats and warnings made to a defense witness. See, e.g., Webb v. Texas, 409 U.S. 95 (1972) (witness refused to testify for the defendant after trial judge singled him out for an extensive admonition about the penalties for perjury and promised to personally see that the witness was indicted and convicted if the witness lied). See also United States v. Morrison, 535 F.2d 223 (3d Cir. 1976) (defense witness asserted Fifth Amendment privilege after prosecutor made repeated warnings about her potential liability for perjury and made indirect warnings during an intimidating personal interview with her).

The defendants did not make a substantial evidentiary showing of prosecutorial misconduct in this case. First, the prosecution's granting of immunity to one witness did not show a deliberate intent to distort the judicial fact-finding process. The prosecution granted immunity to its chief witness, Tom Manley, and presented four other witnesses who did not have immunity, but who had already pled guilty and been sentenced on drug conspiracy charges or were already in jail on other charges. While one prosecution witness did not have counsel, the court stated that if upon cross-examination, it appeared that a question could incriminate the witness, it would stop the proceedings and appoint him counsel. Second, there is no evidence that the government or trial court made threats or warnings to defense witnesses. In fact, the only evidence of remarks made to a witness involved an entreaty made by one of the defendants himself.[9]

Finally, Fortenberry and Washington imply that the district court should have granted judicial immunity to Conaway or compelled the government to request immunity for him. The Eighth Circuit has consistently refused to recognize the concept of "judicial" immunity. United States v. Robaina, 39 F.3d 858, 863 (8th Cir.

---

[9]Kim Herron testified that during the first trial Fortenberry had called her and said, "you don't know nothing, you ain't heard nothing, [my] life depends on it."

1994).  See also United States v. Ayers, 138 F.3d 360, 363 (8th Cir. 1998).
Furthermore, in United States v. Bowling, 239 F.3d 973, 976 (8th Cir. 2001), we held
that the district court lacks the authority to compel the government to request
immunity for a defense witness.  Thus, the district court did not err in its refusal to
grant judicial immunity to Conaway or in its refusal to compel the government to
request use immunity.

## III.

Fortenberry also claims that the district court erred by not conducting a
reasonable inquiry into Conaway's invocation of his Fifth Amendment privilege and
that the court abused its discretion by permitting Conaway to invoke his Fifth
Amendment privilege against self-incrimination.

The district court is ordinarily in the best position to "appreciate the essential
facts" and must "be permitted to exercise some discretion, fructified by common
sense, when dealing with this necessarily difficult subject." Mason v. United States,
244 U.S. 362, 366 (1917).  We review the court's decision to permit the witness to
invoke his or her Fifth Amendment privilege for abuse of discretion.

In United States v. Nelson, 529 F.2d 40, 44 (8th Cir. 1976), we stated that the
district court should, outside the presence of the jury, conduct an inquiry into whether
the witness's responses to the proposed line of questioning would subject the witness
to possible criminal prosecution.  The court must look at whether the hazards of
incrimination are "substantial and real, and not merely trifling or imaginary." In Re
Grand Jury Proceedings (Samuelson), 763 F.2d 321, 324 (8th Cir. 1985) (citing
Marchetti v. United States, 390 U.S. 39, 53 (1968)).  Nevertheless, the trial judge
should order the witness to answer questions "only if it is '*perfectly clear*, from a
careful consideration of all the circumstances in the case that the answer cannot
possibly' tend to incriminate the witness." United States v. Chalan, 812 F.2d 1302,

-12-

1310 (10th Cir. 1988) (citing <u>Hoffman v. United States</u>, 341 U.S. 479, 488 (1951)) (emphasis in original).

Fortenberry's claim that the trial court failed to conduct a reasonable inquiry into the Fifth Amendment request by witness Clarence Conaway is not supported by the record. The court asked Conaway's counsel, out of hearing of the jury, to explain what concerns Conaway had about self-incrimination. Conaway's counsel said that his client was worried about the possibility of future drug charges and about the answers he might be forced to give upon cross-examination. The court allowed Fortenberry's counsel to ask questions of Conaway, but it soon became apparent that Conaway was unwilling to answer questions regarding his drug use and drug transactions with Tom and Jeff Manley. The court concluded:

> I believe the nature and extent of the questions that have been asked and the possibility of cross-examination, the basis of the information that was given to us in chambers off the record when all of counsel was present, would justify this witness invoking his right not to testify on the basis of his Fifth Amendment privileges.

We conclude that the threats Conaway faced were "substantial and real," and that the district court did not abuse its discretion in allowing him to invoke his Fifth Amendment privilege against self-incrimination.[10]

---

[10]The court also conducted an inquiry into whether Barnes could invoke his Fifth Amendment privilege. It determined that the government "would on cross-examination get into some areas that could be very damaging" and that Barnes would open himself up to charges not just in federal court, but in state court as well.

IV.

A.

Washington argues that the district court erred by allowing the government to present a surprise witness, Cheryl Moore, in violation of an order entered by the Magistrate Judge denying Washington's motion for a bill of particulars.[11]

"[The] district court has broad discretion with regard to discovery motions and [we] will uphold the . . . decision of the district court unless, considering all of the circumstances, its rulings were seen to be a gross abuse of discretion, resulting in a fundamental unfairness at trial." United States v. Scott, 26 F.3d 1458, 1463 (8th Cir. 1994) (internal quotations omitted). "[A]ny error in administering discovery rules is not reversible unless prejudicial to the substantial rights of the defendant." United States v. Holland, 884 F.2d 354, 357 (8th Cir. 1989).

Washington claims that the government violated the Magistrate Judge's order by withholding information about government witness Cheryl Moore until two days before her testimony at trial. The government responds that it did not speak with the witness--or know the substance of her testimony--until August 22, 2000, when it informed the court and the defendants.

Even if the government failed to disclose a witness in violation of a discovery order, the defendant still has to show prejudice to his substantial rights. The district

_____

[11]Satisfied with the government's explanation of the charges in response to Washington's motion for a bill of particulars, Magistrate Judge Frederick Buckles denied the motion. However, in his order, he stated that the government had agreed to "inform the defendant if any additional evidence should come into its possession which would be offered in its case in chief as it relates to the defendant Washington's activities as alleged in Count I."

-14-

court can avoid such prejudice by ordering the government to disclose the evidence and allowing the defendant an opportunity to review the evidence before it is presented at trial. See United States v. Zabel, 702 F.2d 704, 709 (8th Cir. 1983). The court can further ensure that the defendant is not prejudiced by allowing for cross-examination of a witness. See United States v. Barnes, 486 F.2d 776, 779 (8th Cir. 1973) ("Where the witness is not disclosed but is produced at trial and the defendant is given ample opportunity for cross-examination no prejudice results").

In Washington's case, whatever prejudice which existed due to the prosecution's late disclosure was remedied by the district court. When the government added witness Cheryl Moore on August 22, the district court told the government to provide defense counsel with her information. Before she testified, defense counsel was able to interview her over the telephone. Moore was also subject to cross-examination by defense counsel. The district court did not abuse its discretion by allowing Moore to testify.

B.

Washington also asserts that the district court abused its discretion by failing to sever his trial from Fortenberry's and by failing to grant a mistrial when Fortenberry stated that Washington had previously sold him crack cocaine.

"Generally, persons charged in a conspiracy should be tried together, especially when proof of the charges against the defendants is based upon the same evidence and acts. Motions to sever rest in the sound discretion of the trial court and the denial of such motions is not grounds for reversal unless clear prejudice and an abuse of discretion are shown." United States v. Arenal, 768 F.2d 263, 267-268 (8th Cir. 1985) (citations omitted). See also United States v. Warfield, 97 F.3d 1014, 1019 (8th Cir. 1996). Severance may only be granted upon defendant's showing of real prejudice. United States v. Voss, 787 F.2d 393 (8th Cir. 1986). A defendant can

-15-

demonstrate real prejudice to his right to a fair trial by showing (a) his defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants. United States v. Jackson, 64 F.3d 1213, 1217 (8th Cir. 1995).

Washington has shown neither in this case. Washington's defense was not irreconcilable with Fortenberry's. Fortenberry attributed responsibility for the murder for hire to Tom Manley and not to Washington. Fortenberry also denied that he and Washington engaged in drug transactions with Manley at Fortenberry's house. Washington has not provided evidence that Fortenberry's defense was antagonistic, much less irreconcilable, with his own. It is only when defenses are actually irreconcilable that severance is required. See United States v. Mason, 982 F.2d 325, 328 (8th Cir. 1993). Furthermore, Washington has not shown that the jury was unable to compartmentalize the evidence as it related to his separate case. The verdict demonstrates that the jury did, in fact, evaluate the charges against each defendant separately. The jury acquitted Washington, but not Fortenberry, on the charge of murder for hire. And where the jury has acquitted one defendant while finding a co-defendant guilty of the same charge, we have held that the jury properly compartmentalized the evidence. See United States v. DeLuna, 763 F.2d 897, 920 (8th Cir. 1986).

As further evidence of prejudice, Washington points to damaging statements made by Fortenberry about him. He argues that these statements are sufficient grounds for a mistrial, and that the district court abused its discretion in not granting a mistrial. During direct examination, Fortenberry's attorney asked, "What's your relationship with Mr. Washington?" Fortenberry responded, "I mean in the beginning, before he went to prison for selling drugs, I was buying crack from him. Before he went to prison." Washington claims that Fortenberry's statement was irrelevant and was offered to show Washington's criminal character. However, Fortenberry's statement was clearly relevant. See United States v. Brown, 956 F.2d

-16-

782, 787 (8th Cir. 1992) ("Evidence of other drug transactions is relevant to demonstrate that the defendant knowingly and intentionally participated in a conspiracy and was not merely an unwitting or uninvolved bystander.") Washington suffered no prejudice that substantially outweighed the relevance of this evidence. This statement by Fortenberry, a co-conspirator, was not elicited by the prosecution; in the words of the district court, he "blurted it out" following a broad question by his own counsel. The government had already provided testimony by Tom Manley and Cheryl Moore regarding Washington's drug dealing. Any prejudice emanating from Fortenberry's statement was not sufficient to warrant a new trial. We conclude there was no abuse of discretion.

## C.

Washington argues that the district court erred by failing to grant a mistrial when several witnesses referred to the previous trial and when government witness James Johnson mentioned that he retained a lawyer because he had received threats.

The decision of whether or not to grant a mistrial is made by the district court, which is in far better position to measure the effect of an improper question on the jury. We review only for abuse of discretion. United States v. Flores, 73 F.3d 826, 831 (8th Cir. 1996).

Washington argues that he was prejudiced by the testimony of three witnesses–Lee Parrish, Kim Herron, and co-defendant Fortenberry–all of whom mentioned that they had testified previously. Neither Parrish nor Herron used the word "trial"; rather, they simply discussed their earlier testimony without referring to the place or manner of that testimony.[12] Fortenberry, however, made a direct reference. His attorney

---

[12] Parrish stated: "That's what I testified on the last time in May." Herron said: "I didn't remember this the first time." Both of these statements are, at best, oblique

-17-

asked, "Did you actually make a phone call to Miss Herron?" Fortenberry responded, "Yes, I did." His counsel followed up, "Around May of 2000?" He replied, "During the trial your saying? . . . She – when I first talked to her, she was in them doors right there [referring to the courtroom] while somebody was on the stand and she giving me signals to call her." Washington's counsel later objected and the court denied the motion for a mistrial.

A similar issue was raised in United States v. Davis, 785 F.2d 610, 618 (8th Cir. 1986), where a defense witness on direct examination confirmed a fact based on "a transcript of the previous trial." Out of the presence of the jury, the court told counsel for both sides to tell their witnesses not to mention the first two trials. We explained that "[i]t was the defense counsel's responsibility to inform her witnesses not to discuss the previous trial." Id. at 619. Furthermore, since the government played no role in eliciting the information and the effect of such information was "highly speculative at best,"[13] there was no reversible error. Id. at 619. Likewise, in Washington's case, because the government did not elicit this information and the prejudicial effect of this information is questionable, we conclude there was no abuse of discretion.

Washington also argues that the court should have granted a mistrial in response to a statement made by government witness James Johnson. When Washington's lawyer asked Johnson, "Why do you have a lawyer?", Johnson responded, "From – because I have been given threats and so forth and for my protection I wanted a witness protection, material protection thing." Instead of

---

references to the earlier mistrial.

[13]We noted in Davis that it was unclear what inference the jury might draw from the earlier proceeding. While such a revelation might harm the defendant, it was also possible that the jury might infer that the government was unable to prove its case in the earlier proceeding. Id. at 619.

curative instructions, Washington's counsel asked for a mistrial. Fortenberry's counsel requested that his client's case be severed from Washington's. The court denied both motions, explaining that Washington's attorney was aware of the threats, and by persisting in his line of questioning, he invited Johnson's response. Since Johnson did not say who made the threats or when they occurred, the prejudicial effect of his statement was somewhat speculative. And in any case, there was not sufficient prejudice to justify a mistrial or severance. Out of hearing of the jury, the district court warned counsel on both sides not to pursue this issue of how and why Johnson was threatened and that the court would grant a mistrial if the issue was revisited. The district court's response was appropriate, and we conclude that it did not abuse its discretion in denying the motion for a mistrial.

D.

Finally, Washington argues that the district court erred by allowing testimony from government witness James Johnson about conversations he had with Washington in St. Louis County Jail. Washington argues that Johnson was sent by the government in order to elicit incriminating information from Washington without the presence of his lawyer in violation of Washington's Sixth Amendment right to counsel.

Washington did not object to the admission of Johnson's testimony during trial, so our review is limited. Accordingly, "we lack authority to consider the question unless (1) the district court committed an error, i.e., deviated from a legal rule, (2) the error is plain, i.e., clear under current law, and (3) the error affected [Washington's] substantial rights." United States v. White, 241 F.3d 1015, 1023 (8th Cir. 2001) (citations omitted).

In Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986), the Supreme Court stated that the chief concern behind the line of Sixth Amendment cases dealing with prison

-19-

informants is that the investigatory techniques used by the police in prison might become the equivalent of direct police interrogation. The Court went on to explain what constitutes a constitutional violation: "a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Id.

In order for Washington to prevail on this claim, he must show: (1) that the right to counsel had attached, (2) that Johnson was indeed a government agent, and (3) that Johnson deliberately sought incriminating statements from him. Moore v. United States, 178 F.3d 994, 999 (8th Cir. 1999).

The government does not dispute that Washington's Sixth Amendment right to counsel had already attached when he made incriminating statements to Johnson. Rather, it argues that Johnson was not a government agent and did not solicit this information. Johnson was moved near Washington's cell because he was awaiting admission into a drug rehabilitation center in Missouri. According to Johnson, he and Washington began playing chess together and having conversations about Washington's "situation." The record shows that Johnson's meeting with the DEA agent occurred after these conversations with Washington. Washington has presented no evidence that Johnson was directed by the government to secure information about the case. Likewise, there is no after-the-fact evidence that the government commandeered Johnson's services: Johnson was not paid and did not receive a reduction in his sentence for his cooperation. We conclude that Johnson was not a government agent when he had these conversations with Washington, and hence, there was no error affecting Washington's substantial rights.

## V.

Fortenberry argues that the court erred in enhancing his sentence under Sentencing Guideline § 3C1.1 for obstruction of justice.

"We reverse a district court's factual finding in support of a section 3C1.1 enhancement only if it is clearly erroneous." United States v. Clay, 16 F.3d 892, 896 (8th Cir. 1994). Sentencing Guideline § 3C1.1 provides for an upward adjustment of two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to the defendant's offense of conviction." See U.S.S.G. § 3C1.1 (2002). Obstruction of justice under this adjustment provision includes committing, suborning, or attempting to suborn perjury. U.S.S.G. § 3C1.1, comment. (n.4(b)). The burden of proof lies with the government to show the facts necessary at the sentencing hearing. "The adjustment cannot be given simply because a defendant testifies on his own behalf and the jury disbelieves him. The district court itself must find that the defendant committed perjury before making the upward adjustment." United States v. Willis, 940 F.2d 1136, 1140 (8th Cir. 1991).

In Fortenberry's case, the district court found that he had testified under oath, that he had lied about a material fact, that his testimony was inconsistent with the majority of evidence, and that he knew he was lying. The court found that while Fortenberry acknowledged his participation in the drug conspiracy, his testimony regarding his whereabouts during the morning of the murders was not believable. The court found that "this defendant did in fact openly and intentionally falsify his testimony in many, many areas involving Count 2 and Count 3, even [though] he may have admitted his involvement to some extent with the drug conspiracy set out in Count 1." We conclude there was no error.

In any case, a removal of the enhancement would have no effect on the sentence. Under 18 U.S.C. § 1958(a), the penalty for a murder for hire resulting in death is life imprisonment. The guidelines manual provides that "[w]here a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence." See U.S.S.G. § 5G1.1(b) (2002). See also United States v. McCabe, 270 F.3d 588, 590 (8th Cir. 2001).

Having considered and rejected any possible errors by the district court, we affirm the convictions and sentences of Wendell Fortenberry and Earnest Washington.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-22-