# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2309

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| David Elby Shafer, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: January 13, 2010
Filed: June 24, 2010

_____

Before LOKEN, Chief Judge,[1] JOHN R. GIBSON, and WOLLMAN, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

David Elby Shafer was convicted of six criminal counts based on drug trafficking and the use of proceeds from drug trafficking. He was sentenced to 180 months' imprisonment. He appeals his conviction, arguing that the district court[2]

_____

[1]The Honorable James B. Loken stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2010. He has been succeeded by the Honorable William Jay Riley.

[2]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri. The Honorable William A. Knox, United States Magistrate Judge for the Western District of Missouri, handled pretrial matters. As

erred in denying his motions to suppress evidence and his motions for judgment of acquittal. Shafer also contends that he was denied his Sixth Amendment right to confront witnesses and that his motion to change venue should have been granted. We affirm.

## I. Background

From 2002 until his arrest in 2005, Shafer was trafficking large quantities of marijuana in the Western District of Missouri. He had purchased hundreds of pounds of marijuana with his associates Andres Trenco and Jonathon Rocha. Gregory Tetro assisted Trenco and Rocha with distributing the marijuana.

In 2004, Shafer began transporting marijuana from Texas to Missouri for distribution. On one occasion, he offered to sell cocaine to Trenco and Wayne Hawkins. In late 2004, Shafer hired Galen Scott to transport drugs and money between Texas and Missouri. Shafer had limited legitimate income, but he nonetheless made large cash purchases.

In May 2005, Shafer was charged with the following crimes: (1) conspiracy to distribute and possess with intent to distribute more than 100 kilograms of marijuana, (2) possession with intent to distribute less than fifty kilograms of marijuana, (3) interstate transportation in aid of racketeering, and (4) conspiracy to commit money laundering. He was arrested in June 2005 in front of his apartment in Rockport, Texas.

Following his arrest and indictment, Shafer moved for a number of continuances, which were granted. In November 2006, Shafer was charged in a

---

relevant to this appeal, Magistrate Judge Knox issued reports and recommendations on Shafer's motions to suppress and issued orders regarding Shafer's motions to change venue and to compel the production of documents.

superseding indictment that included two additional counts: engaging in a monetary transaction in criminally derived property of a value greater than $10,000 and conspiracy to distribute and possess with intent to distribute cocaine. Shafer's pretrial motions to suppress evidence and change venue were denied. His motion to compel the production of the presentence investigation reports (PSRs) of cooperating witnesses was granted in part and denied in part.

Shafer's trial began in June 2008. On the third day of trial, the district court denied Shafer's motion for a continuance to investigate whether one of the cooperating witnesses had been involved in a theft. Shafer was convicted on all counts.

## II. Motions To Suppress

Shafer contends that the district court erred in denying his motions to suppress (1) evidence related to $56,000 that was seized during a traffic stop in Texas and (2) evidence related to the contents of his briefcase that was seized after his arrest. In reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and review *de novo* its determination that the search did not violate the Fourth Amendment. United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008).

### A. Denial of the Motion To Suppress the $56,000

#### 1. Traffic Stop, Drug-Dog Sniff, and Search

On December 17, 2004, Sergeant Michael Nix of the Texas Highway Patrol initiated a traffic stop on a Mercedes that was traveling eighty-nine miles per hour in a seventy miles per hour zone. The entire stop was recorded by the squad car's mounted camera. The Mercedes pulled over to the side of the road at 3:00 p.m., and

Nix approached, noticing that the car did not have a rear license plate and had a Missouri dealer tag in the window. Nix asked the driver to step out of the car and provide her license. Diana Shafer, Shafer's wife, provided her Texas driver's license and explained that they had returned to Texas, where her son had been arrested and jailed for public intoxication, from Missouri, where she had been receiving medical treatment.

Nix approached the passenger's side and observed Shafer, who was wearing a shirt and cap that said "police" in bold lettering. Shafer indicated that he was not a police officer but that he wore the attire so that people would leave him alone. Nix asked Shafer for his identification. When Nix bent down to take the identification, he thought he smelled marijuana. Nix was not entirely confident in his sense of smell, however, because he was suffering from a cold and was congested. Shafer produced a Missouri driver's license and told Nix that they had been in Missouri for a couple of days and were returning home to Texas. Because he thought he had smelled marijuana, Nix asked Mrs. Shafer if there were any illegal narcotics or weapons in the car, to which she replied no.

Nix returned to his car at 3:05 p.m. and ran license and criminal history checks. Dispatch was slow to respond to his radio request, so Nix called dispatch on his cellular phone to speed up the process. At 3:10 p.m., Nix exited his car and asked Mrs. Shafer, who was standing behind the Mercedes, for her social security number so that her criminal history check could be completed. He returned to his car and noted that the Shafers seemed nervous. After learning that Mrs. Shafer had no criminal history and that Shafer had numerous offenses many years ago, Nix again exited the squad car to complete the citation. Nix explained to Mrs. Shafer that she could take a defensive driving course to have the citation removed from her record. As Nix was walking back to the Mercedes, Mrs. Shafer called out to him, asking additional questions about the defensive driving course. Nix thought that she might be trying to divert his attention away from the car or Shafer. When Nix finally

returned to the Mercedes, he asked Shafer about his prior convictions and whether he had any guns or narcotics in the car. Shafer replied that he did not, whereupon Nix returned to Mrs. Shafer and asked her about Shafer's prior convictions.

At 3:19 p.m., Nix asked Mrs. Shafer for permission to search the car, which she refused. Seconds later, Nix waved down a passing canine unit. Nix explained that the dog would circle the car and that if it did not alert, Nix would give Mrs. Shafer the citation and they would be free to leave. At 3:27 p.m., the dog and its handler completed a cursory pass around the car, and at 3:31 p.m., Nix was informed that the dog had alerted for narcotics.[3] At that point, Nix searched the car and discovered a duffel bag containing $56,000 cash. Shafer explained that his lawyer had told him to sell his belongings and keep the cash so that the bank would be unable to access those assets when he declared bankruptcy. Nix seized the $56,000 but did not arrest the Shafers.

## 2. Reasonable Suspicion for Drug-Dog Sniff

Shafer contends that the evidence concerning the $56,000 should have been suppressed because the Shafers were detained longer than necessary for a traffic stop and without reasonable suspicion of criminal activity. The government responds that Nix's observations during the traffic stop were sufficient to support a reasonable suspicion that criminal activity was afoot and thus justified the minimal delay associated with the dog sniff.

An officer who observes a violation of the law has probable cause to initiate a traffic stop, and such a stop is consistent with the Fourth Amendment. Peralez, 526

---

[3]No drugs were found in the car. The canine officer explained that if marijuana is smoked in a car, the odor can linger there for a long time. Mrs. Shafer acknowledged that she had smoked marijuana while wearing clothes that she had packed in her bag, which was located inside the car.

F.3d at 1119 (citing Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) (per curiam)). "[T]he officer is entitled to conduct an investigation reasonably related in scope to the circumstances that initially" prompted the stop. United States v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004) (quoting United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam)). Additionally, the officer may ask routine questions such as the destination, route, and purpose of the trip, and whether the officer may search the vehicle. United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999). The occupants of the vehicle may be detained "while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." Id. "A constitutionally permissible traffic stop can become unlawful, however, 'if it is prolonged beyond the time reasonably required to complete' its purpose." Peralez, 526 F.3d at 1119 (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

To continue to detain a vehicle's occupants after the initial stop is completed, the officer must have been aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." United States v. Donnelly, 475 F.3d 946, 952 (8th Cir. 2007) (quotation omitted) (citing Terry v. Ohio, 392 U.S. 1, 20-21 (1968)). "Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at the totality of the circumstances, in light of the officer's experience." United States v. Gill, 513 F.3d 836, 844 (8th Cir. 2008) (quotation omitted).

Shafer concedes that the initial stop was lawful, and there is no dispute that the related questioning of the couple was within constitutionally permitted bounds. By the time Nix returned to the Mercedes to ask Shafer about his criminal history, Nix had completed the citation, and the amount of time otherwise justified by the initial traffic stop had expired. Accordingly, for Shafer's continued detention to comport

with the Fourth Amendment, Nix must have had a particularized and objective basis for suspecting criminal activity.

Based on the totality of the circumstances, we conclude that reasonable suspicion of criminal activity supported Nix's limited further investigation. Nix testified that the expanded scope of the traffic stop was based on the following facts: the car had the odor of marijuana; Shafer was wearing police attire to avoid being bothered; the Shafers gave somewhat different accounts of their travels and avoided eye contact; Mrs. Shafer's hands were shaking and she appeared nervous; Mrs. Shafer's further questioning detained Nix from returning to Shafer and the Mercedes; and Shafer had a criminal history. From these facts, Nix inferred that the Shafers might have contraband in the car, most likely drug related, based on the odor he thought he smelled. This reasonable suspicion of criminal activity permitted Nix to briefly question Shafer and to wave down the canine unit.

The record does not support Shafer's assertion that Nix deliberately delayed the traffic stop so that a canine unit could arrive on the scene. Although thirty-one minutes had passed from the time Nix initially stopped the car until the canine alerted, Nix waved down a canine unit shortly after he finished his conversation with Shafer and seconds after Mrs. Shafer declined consent to search the car. Nix's reasonable suspicion supported the continued detention, and the delay was not excessive under the circumstances. See United States v. Lyons, 486 F.3d 367, 372 (8th Cir. 2007) (holding that a thirty-one minute delay between the issuance of a warning ticket and the arrival of the canine unit was not unreasonable given that the officer called for the nearest available canine unit immediately after developing a reasonable suspicion of narcotics possession and was denied permission to search).

B.  Denial of Motion To Suppress Contents of Shafer's Briefcase

1.  Arrest and Consent To Search

When law enforcement officials arrested Shafer, they had an arrest warrant but did not have a search warrant.  Agents from the Drug Enforcement Administration and the Internal Revenue Service (IRS) and officers from the Rockport police department executed the arrest.  IRS special agent Jeff Thomas read Shafer his rights.  Shafer acknowledged that he understood them and agreed to be interviewed.  He refused Thomas's request for permission to search the residence.

Thomas commenced the interview during the ride from Shafer's residence to the county jail, some thirty miles away.  Thomas asked about Shafer's vehicles, his boat, and any bank accounts.  Shafer indicated that he had his financial information in a briefcase at his residence and that he would provide it to the agents if they returned to his residence.  The agents and Shafer returned to the Rockport apartment.  Shafer wanted to go into the apartment alone, but the agents refused to allow him to do so.  Because the door had been locked and the keys left inside the apartment, Shafer directed the agents to a window, through which one agent entered the apartment and unlocked the door.  Shafer led the agents through the apartment, past several guns on the floor and on the kitchen counter, to a bedroom, where more guns, a scale, and the briefcase were located.   The agents brought the briefcase into the living room and emptied its contents, which included cashier's check receipts, deposit tickets, asset purchase information, and vehicle titles.

At the suppression hearing, Thomas testified that he had offered to take only the bank statements and vehicle records but that Shafer had instructed him to keep the contents together.  Accordingly, Thomas put the contents back into the briefcase, except a handcuff key and a knife, which were left in the apartment.  Thomas testified that Shafer may have asked the agents to allow him to review the documents, but the

-8-

request was refused because Shafer was handcuffed and under arrest. When asked why he seized only the briefcase, Thomas replied, "That's all he said I could take." On cross examination, Thomas recounted that "I specifically said, can I just take [certain financial records] and he said no, keep it all together."

Shafer testified that he did not give Thomas consent to take the briefcase and its contents. Shafer had planned to go through the briefcase and extract the necessary documents. When Shafer asked to be unhandcuffed, Thomas refused and began looking through the briefcase. Shafer testified that he told Thomas:

> [Y]ou can't go through that. That stuff belongs to an attorney of mine in Cameron, Texas, and he said he didn't care, that he was taking it. And I said you can't take that. I said that don't belong to you. It's mine. And I told you I'd get what I wanted out of it.

When asked whether Shafer wanted the agent to take documents from the briefcase and the briefcase itself, Shafer responded, "I didn't want him in it period. I asked him to unhandcuff me and I would get what he needed out of it."

The law enforcement officials did not search the apartment, nor did they seize the guns or the scale that were in plain sight. In reviewing the documents that were held within the briefcase, Thomas came across but did not open a sealed envelope addressed to Shafer's attorney.

Shafer's motion to suppress the contents of the briefcase was denied. The magistrate judge's report and recommendation credited Thomas's testimony, concluding that "Agent Thomas reasonably concluded that defendant Shafer voluntarily consented to the search of his residence for the limited purpose of obtaining the briefcase containing his financial documents, and consented to the search and seizure of such briefcase." The district court adopted the magistrate judge's report and recommendation.

## B. Consent To Seize the Briefcase

"The Fourth Amendment protects individuals against unreasonable searches and seizures by the government." United States v. Luken, 560 F.3d 741, 744 (8th Cir. 2009) (quoting United States v. Williams, 521 F.3d 902, 905 (8th Cir. 2008)). The Fourth Amendment generally requires the government to obtain a warrant before searching an area where an individual has a reasonable expectation of privacy. See United States v. Parker, 587 F.3d 871, 878 (8th Cir. 2009). A search conducted pursuant to voluntary consent is recognized as an exception to the Fourth Amendment's search warrant requirement. Schneckloth v. Bustamonte, 412 F.3d 218, 219 (1973).

Consensual searches are consistent with the Fourth Amendment, "because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." Id. (quoting Florida v. Jimeno, 500 U.S. 248, 250-51 (1991)). The boundaries of a consensual search are confined to the scope of the consent, which is measured by a standard of objective reasonableness. To determine the scope, we consider what "the typical reasonable person [would] have understood by the exchange between the officer and the suspect." United States v. Siwek, 453 F.3d 1079, 1085 (8th Cir. 2006) (quoting Jimeno, 500 U.S. at 251).

Shafer argues that his motion to suppress should have been granted because Thomas exceeded the scope of consent when he seized the briefcase and its contents. The only disputed fact is whether Shafer gave permission for the briefcase to be seized.

The magistrate judge resolved the disputed fact by finding that Thomas's testimony was credible. A credibility finding made by a magistrate judge "after a hearing on the merits of a motion to suppress is virtually unassailable on appeal." United States v. Starr, 533 F.3d 985, 995 (8th Cir. 2008) (quoting United States v.

Frencher, 503 F.3d 701, 701 (8th Cir. 2007)). The magistrate judge did not err in finding that Shafer consented to the seizure of the briefcase. The undisputed facts show that the agents had respected Shafer's initial decision to decline consent to search the home and that Shafer had asked to return to his residence to retrieve relevant financial documents. Shafer allowed the agents to enter the residence, and he led them to the bedroom where the briefcase was located. The search and seizure were limited to the briefcase; the agents did not conduct a full search of the residence and did not seize the scale or the numerous guns that were in plain sight. Nothing in the record suggests that the events leading up to the seizure of the briefcase were conducted without Shafer's consent. We agree with the magistrate judge's credibility finding and conclude that a typical person would have understood the exchange between Thomas and Shafer to allow Thomas to seize the briefcase and its contents.

## III. Confrontation Clause Issues

Shafer contends that the district court abused its discretion when it denied his motion to compel the production of PSRs of the cooperating witnesses and his motion for continuance to investigate whether Hawkins was involved in a theft. He argues that the PSRs and the additional time would have allowed him to discover evidence bearing on the witnesses' credibility. Moreover, he alleges that the PSRs might contain material information that should have been disclosed to him under Giglio v. United States, 405 U.S. 150 (1972), and Brady v. Maryland, 373 U.S. 83 (1972). He contends that the errors resulted in the denial of his Sixth Amendment right to confront witnesses and his Fifth Amendment right to a fair trial.

### A. Presentence Investigation Reports

When the motion to compel was submitted for decision, PSRs had been completed for Trenco, Rocha, Hawkins, and Paul Cook. The government represented that it had access to those PSRs, and the matter was taken under advisement. The

magistrate judge conducted an *in camera* review of the PSRs and determined that the statements set forth therein were contained in files available to Shafer, including law enforcement files, transcripts of plea proceedings, and transcripts of sentencing proceedings. Only Cook had made a separate statement to the probation officer. The magistrate judge determined that the statement did not exonerate Shafer or reduce his liability, but if Cook was called to testify as a witness, the statement should be made available to Shafer for impeachment purposes. Shafer did not renew his motion to compel as to Tetro or Scott, whose PSRs had not been prepared at the time the magistrate judge issued his decision. Cook did not testify against Shafer.

PSRs are generally treated as confidential pursuant to Rule 32 of the Federal Rules of Criminal Procedure. United States v. Pena, 227 F.3d 23, 26 (2d Cir. 2000) ("[T]here has been a longstanding judicial view that confidentiality should be maintained because the public availability of presentence reports would likely inhibit the flow of information to the sentencing judge.") (internal alterations, quotations, and citation omitted)); United States v. Figurski, 545 F.2d 389, 391 (4th Cir. 1976) ("[I]nformation contained in a presentence report should not be disclosed to third parties unless lifting confidentiality is required to meet the ends of justice.") (internal quotations and citation omitted)). PSRs, however, may contain information that the government is required to disclose to the defendant. See Giglio, 405 U.S. at 153-55 (requiring the government to disclose matters that affect the credibility of its witnesses); Brady, 373 U.S. at 87 (requiring the government to disclose evidence that is both "favorable to an accused" and "material either to guilt or to punishment").

The magistrate judge followed the correct approach in this case, issuing his decision after completing an *in camera* review of the available PSRs. See United States v. Garcia, 562 F.3d 947, 953 (8th Cir. 2009) (holding that the district court abused its discretion in failing to conduct an *in camera* review of cooperating witnesses' PSRs after the defendant sought access to them and the government requested review). Having examined the relevant PSRs, we conclude that the

magistrate judge did not fail to turn over any exculpatory evidence or impeachment material and thus did not abuse his discretion in denying in part and granting in part Shafer's motion to compel. See United States v. DeVore, 839 F.2d 1330, 1332 (8th Cir. 1988) (conducting *in camera* review of PSR to determine whether district court abused its discretion in denying defendant's motion to discover PSR).

## B. Motion for Continuance

We review the denial of a motion for continuance for abuse of discretion, considering "the amount of time granted for preparation, the conduct of counsel at trial, and whether prejudice appears from the record." United States v. Parker, 587 F.3d 871, 879 (8th Cir. 2009). Three years had passed from the time Shafer was arrested until he went to trial. Following the second day of trial, Shafer's attorney learned of an allegation that Hawkins, a cooperating witness, had stolen funds from an attorney. The next day, Shafer moved for a continuance to investigate the allegation. The facts and circumstances related to the alleged theft were vague and unsubstantiated. Moreover, any information uncovered in the investigation would have been used to undermine Hawkins's credibility; the alleged theft was unrelated to the charges against Shafer. As the district court noted, there was "plenty in the record to question the credibility of Mr. Hawkins." Shafer has failed to show that he suffered prejudice, and the district court did not abuse its discretion in denying the continuance.

## IV. Motions for Judgment of Acquittal

Shafer contends that his motions for judgment of acquittal should have been granted as to counts five and six because the evidence was insufficient to support his convictions for monetary transaction in criminally derived property and conspiracy to distribute and possess with intent to distribute cocaine. "We review the sufficiency of the evidence *de novo*, viewing the evidence in the light most favorable to the

government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Lockett, 601 F.3d 837, 840 (8th Cir. 2010) (quoting United States v. Washington, 318 F.3d 845, 852 (8th Cir. 2003)). We will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. Id.

### A. Monetary Transaction in Criminally Derived Property

On November 18, 2004, Shafer and his wife purchased a 1996 Mercedes S420 from a used car dealer in Columbia, Missouri. The dealer and Shafer negotiated a purchase price of $14,000, and Mrs. Shafer handed over $13,500 cash from her purse. After realizing that they were $500 short, Shafer called Justin Richards, who had transported marijuana and collected money for Shafer, and asked him to bring the remaining $500. Richards brought the cash, which he later identified as Shafer's money, to the dealership. Shafer ultimately paid $13,800 for the car.

The purchase of the Mercedes served as the basis for count five of the indictment, monetary transaction in criminally derived property, in violation 18 U.S.C. § 1957. Section 1957 prohibits anyone from knowingly engaging "in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." Shafer contends that the government failed to prove that at least $10,000 of the purchase payment for the Mercedes was the proceeds of his drug trafficking. Shafer suggests that the purchase money came from a lawsuit settlement payment Mrs. Shafer had received in January 2004.

"[T]he Government is not required to trace funds to prove a violation of § 1957." United States v. Pizano, 421 F.3d 707, 723 (8th Cir. 2005). The government presented evidence that the Shafers had declared bankruptcy in 2000 and had earned approximately $68,000 in verifiable income from 2000 to 2003. Their only legitimate source of income in 2004 was the above-mentioned settlement payment of

$32,704.90, which was deposited in their bank account in early January 2004. By the end of January, the Shafers had withdrawn those funds and closed the account. The Shafers had spent $116,766.33 in cash in 2004, and the evidence showed that Shafer's drug distribution business generated large amounts of cash. It is undisputed that the $500 that Richards delivered to the dealership was the proceeds of drug distribution. Given their limited legitimate income, their significant cash purchases, Shafer's extensive drug distribution and cash dealings, and that ten months had passed from the time they withdrew the settlement payment from the time they purchased the Mercedes, a reasonable jury could conclude that the Mercedes was purchased with the proceeds from Shafer's drug distribution. Accordingly, the evidence was sufficient to support the jury's verdict, and the district court properly denied Shafer's motion for judgment of acquittal on count five.

B. Conspiracy To Distribute and Possess with Intent To Distribute Cocaine

Shafer delivered 120 pounds of marijuana to Trenco and Hawkins in April 2004 and offered them one pound of cocaine for $12,000. Hawkins took possession of the cocaine and attempted to sell it, but was unable to do so. Some of the marijuana could not be sold because of its poor quality. At Shafer's direction, Trenco, Hawkins, and Tetro returned the cocaine and the inferior marijuana to Cook, Shafer's associate, at a house in Sturgeon, Missouri.

In late April 2004, a search warrant was executed at Cook's residence. Law enforcement officials found the inferior marijuana, but did not find any cocaine. At trial, Shafer testified that he never dealt in cocaine and that he was not serious when he told Hawkins that he could provide cocaine.

Shafer contends that the evidence was insufficient to support his conviction of conspiracy to distribute and possess with intent to distribute cocaine. To convict a defendant of conspiracy, the government must prove the existence of an agreement to

achieve an illegal purpose, the defendant's knowledge of the agreement, and the defendant's knowing participation in the agreement. Lockett, 601 F.3d at 840. The agreement does not need to be formal or explicit; "a tacit understanding will suffice." Id.

Based on the evidence presented at trial, a reasonable jury could infer that Shafer knowingly entered an agreement to distribute cocaine and knowingly participated in that agreement. Trenco and Hawkins testified that Shafer offered to sell them one pound of cocaine for $12,000. Hawkins testified that he took possession of the cocaine and delivered a sample to one of Tetro's associates but was unable to sell it. Trenco, Hawkins, and Tetro testified that they returned the cocaine to Cook at Shafer's direction. Although Shafer testified that he was not serious when he said that he could provide cocaine, the jury decided to credit the cooperating witnesses' testimony. The fact that the cocaine was not found during the search of Cook's residence does not conclusively show that the cocaine conspiracy never existed. Several days had passed from the time the cocaine had been returned until the residence was searched. We affirm the district court's denial of Shafer's motion for judgment of acquittal on count six.

## V. Venue

We find no abuse of discretion in the magistrate judge's denial of Shafer's motion to change venue to the Southern District of Texas. See United States v. Stanko, 528 F.3d 581, 584 (8th Cir. 2008) (standard of review).

## Conclusion

The judgment is affirmed.

_____

-16-