# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-3159

_____

United States of America,

        Appellee,

v.

Steven A. Mueller,

        Appellant.

_____

No. 10-3691

_____

United States of America,

        Appellee,

v.

James K. Kornhardt,

        Appellant.

\* \* \* \* \* \* \* \* \*

Appeals from the United States
District Court for the
Eastern District of Missouri.

_____

Submitted: June 16, 2011
Filed: November 10, 2011

_____

Before MURPHY and SMITH, Circuit Judges, and SCHREIER,[1] District Judge.
_____

SCHREIER, District Judge.

Appellant Steven Mueller challenges his convictions on conspiracy to commit murder-for-hire and murder-for-hire by raising seven arguments: (1) the trial court[2] erred in denying his motion to dismiss the murder-for-hire charge and the related conspiracy charge because they were barred by the statute of limitations; (2) his motion for severance was improperly denied; (3) the second superseding indictment failed to state an offense; (4) the prosecutor's remarks during closing arguments constituted prosecutorial misconduct; (5) the trial court erred in finding him competent to stand trial; (6) his due process right to a competency hearing was violated; and (7) there was insufficient evidence to support the jury's verdict. Appellant James Kornhardt challenges his convictions on conspiracy to commit murder-for-hire, murder-for-hire, and obstruction of justice contending that the convictions were barred by the statute of limitations, severance was improperly denied, and his Sixth Amendment confrontation rights were denied. We affirm on all counts.

## I. Background

Karen Coleman wanted to kill her husband, Danny Coleman. She told her friend, Michelle Nolan, that she wanted to kill Danny. Michelle had Karen talk to Larry Nolan, Michelle's husband. Larry asked about the amount of life insurance Danny had and then agreed to have Danny killed in exchange for part of the life

---

[1] The Honorable Karen E. Schreier, Chief Judge, United States District Court for the District of South Dakota, sitting by designation.

[2] The Honorable Charles A. Shaw, United States District Court Judge for the Eastern District of Missouri.

insurance proceeds. Larry arranged for Karen and Kornhardt to meet and discuss killing Danny. Karen agreed to pay $15,000 to Kornhardt and an unspecified amount to Larry. To help kill Danny, Kornhardt enlisted his friend Mueller.

On October 22, 1992, Kornhardt, Mueller, and another individual, "Dozer," beat Danny to death in another individual's house. Danny's body was ultimately found in a vehicle that had been set on fire in an open field. A new box of matches was found near the truck. Fingerprints were found on the cellophane wrapper of the box, but at that time the police were unable to match the fingerprints to anyone. The investigation into Danny's death eventually came to a standstill.

Then in 1999 an inmate, Michael Kempker, disclosed information about Danny's death to law enforcement. Michael was Larry's friend when the two men were in prison together. Larry had asked Michael to procure a silencer to be used in Danny's murder. The silencer had been given by Michael's father to Kornhardt in exchange for $1,000.

Based on Michael's information, law enforcement questioned Kornhardt and eventually matched his fingerprint to one that had been found on the box of matches. Kornhardt and Karen were then indicted for Danny's murder. While Kornhardt was in jail, he called Mueller on the phone and directed him to immediately remove several items that were hidden in a fireplace and in a detached garage, which were located on Kornhardt's property. This phone conversation was recorded and eventually overheard by the authorities.

After listening to the recording, an agent with the United States Bureau of Alcohol, Tobacco & Firearms (ATF) questioned Mueller about the items he removed from the house and garage and about Danny's death. Mueller admitted to the agent that he had disposed of a silencer, gun, and ammunition. Mueller told the agent various stories about what had happened on the day that Danny was killed, including

one account of the murder where three men beat Danny with bats and fighting sticks and then shot him three times. Mueller showed the agent where Danny was killed and walked him through the crime scene while explaining what happened. He admitted to the agent that he shot Danny and had received $1,000 to $1,200 for his role in the murder. He ultimately testified to a grand jury that he had removed the silencer and gun from the house and garage after the phone conversation with Kornhardt.

A second superseding indictment charged Karen, Kornhardt, and Mueller with murder-for-hire and conspiracy to commit murder-for-hire. Additionally, Kornhardt was charged with obstruction of justice based on his phone conversation with Mueller. Karen pleaded guilty to murder-for-hire and conspiracy to commit murder-for-hire. Mueller and Kornhardt went to trial.

During the trial, Karen testified that she received checks totaling $150,000 through the mail from various insurance companies, which were subsequently deposited into her bank account. The first insurance payment was received on October 6, 1993, and the final payment was received on July 15, 1997. She also testified that she paid $15,000 of the insurance proceeds to Kornhardt in October of 1994 for his role in killing Danny. After a six-day jury trial, Kornhardt and Mueller were convicted of murder-for-hire and conspiracy to commit murder-for-hire. The jury also found Kornhardt guilty on the obstruction of justice charge.

## II.    The Issues Raised by Both Mueller and Kornhardt

### A.    Statute of Limitations

Appellants argue that the trial court erred in denying their motions to dismiss the charges of murder-for-hire and conspiracy to commit murder-for-hire because they are barred by the statute of limitations. We review de novo the district court's

denial of a motion to dismiss the indictment on the grounds that the statute of limitations had expired. United States v. Hance, 501 F.3d 900, 905 (8th Cir. 2007).

Prior to September 13, 1994, the murder-for-hire statute, 18 U.S.C. § 1958(a), provided as follows:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, shall be fined not more than $10,000 or imprisoned for not more than ten years, or both; and if personal injury results, shall be fined not more than $20,000 and imprisoned for not more than twenty years, or both; and if death results, shall be subject to imprisonment for any term of years or for life, or shall be fined not more than $50,000, or both.

Section 1958(a) fell under the general "catchall" federal criminal statute of limitations, which imposed a five-year statute of limitations for non-capital federal offenses. See 18 U.S.C. § 3282(a).

Effective September 13, 1994, Congress amended § 1958 by increasing the maximum punishment to death in the event that death resulted from the murder-for-hire. No statute of limitations applies to an indictment for an offense punishable by death. See 18 U.S.C. § 3281. As a result, effective September 13, 1994, a murder-for-hire that results in a death is not subject to a statute of limitations.

Appellants argue that the ex post facto clause forbids the application of a penalty increase to an already completed crime. Appellants contend that the murder-for-hire and the conspiracy to commit murder-for-hire were completed on or about

October 6, 1993, and therefore, application of § 1958(a) as amended violates the ex post facto clause.

The ex post facto clause generally prohibits the retroactive application of a criminal statute that changes the legal consequences for a crime after it was committed. Miller v. Florida, 482 U.S. 423, 430 (1987). Two elements must be met before legislation violates the ex post facto clause: (1) the legislation in question must apply to events occurring before its enactment; and (2) the offender affected by the legislation must be disadvantaged. United States v. Chandler, 66 F.3d 1460, 1467 (8th Cir. 1995) (citing Miller, 482 U.S. at 430). The ex post facto clause "forbids the application of any law that increases punishment to preexisting criminal conduct." United States v. Sidney, 648 F.3d 904, 909 (8th Cir. 2011) (citations omitted).

Count two of the second superseding indictment alleges that from 1991 to 1997, appellants used "the mail and other facilities in interstate commerce with the intent that the murder of Danny H. Coleman be committed . . . as consideration for the receipt of, and as consideration for, a promise and agreement to pay things of pecuniary value, that is, money gained from the proceeds of Danny H. Coleman's insurance polices." To convict defendants of murder-for-hire, the government had to prove that appellants (1) used or caused another to use the mail or a facility in interstate commerce, (2) with the intent that a murder be committed, (3) for hire. United States v. Delpit, 94 F.3d 1134, 1149 (8th Cir. 1996). Generally, " '[a]n offense is committed when it is completed, that is, when each element of that offense has occurred.' " United States v. Gonzalez, 495 F.3d 577, 580 (8th Cir. 2007) (quoting United States v. Yashar, 166 F.3d 873, 875 (7th Cir. 1999)).

The nature of the crime of murder-for-hire focuses on "the use of the facilities of interstate commerce or of the mails with the requisite intent[.]" Delpit, 94 F.3d at 1150. Evidence of insurance transactions arising from the death of the victim, which involved the mails and interstate facilities, and payment of a portion of those

insurance proceeds to a defendant are sufficient evidence to show the required nexus between using the mail or facilities in interstate commerce and the murder-for-hire scheme. United States v. Basile, 109 F.3d 1304, 1312-13 (8th Cir. 1997). Even if the insurance proceeds are collected after the murder is complete, a defendant can still be found guilty of murder-for-hire. Id. at 1312 n.9.

While some of appellants' conduct necessary to fulfill the elements of murder-for-hire occurred prior to the amendment to § 1958(a), conduct essential to completing the crime and proving the murder-for-hire scheme, such as receipt of pecuniary gain and the use of the mails to obtain life insurance proceeds, occurred after the amendment to § 1958(a) took effect. This scheme was premised around life insurance proceeds; in fact, Larry specifically asked Karen what amount of life insurance was available, and he agreed to the murder plan in exchange for a portion of those proceeds. And as appellants stipulated at trial, Karen was still using the mails to reap the rewards of those insurance proceeds in 1997. Moreover, the evidence that concretely proves that Kornhardt and Mueller were "hired" to commit murder was the receipt of the $15,000 payment, which occurred in October of 1994 after the amendment went into effect. This evidence of the hitmen's pecuniary benefit and its connection to Danny's insurance proceeds is fundamental to fulfilling the elements of the murder-for-hire charge.

Mueller, citing United States v. Delpit, 94 F.3d 1134 (8th Cir. 1996), argues that the intent to commit murder-for-hire must be formed before the murder occurs and that once the interstate commerce facility is used with the required intent, then the crime is complete. Mueller contends that because the intent to commit murder-for-hire could only have been formed on or prior to Danny's death on October 22, 1992, the applicable statute of limitations is five years. Delpit, however, is distinguishable because the use of the interstate commerce facility in that case was the hitman traveling to the target in Minnesota, and there was no motive to kill for insurance proceeds. Id. at 1150. The defendant recruited the hitman to travel to Minnesota to

kill rival gang members, and after the hit failed the defendant told the hitman to keep trying and agreed to send partial payment to the hitman's wife. Id. Because the interstate commerce nexus in Delpit was the defendant causing the hitman to travel in interstate commerce before the attempted hit, the crime was complete after the hitman attempted the hit because the hitman had already traveled and received his partial payment. Here, the interstate commerce nexus was the receipt of insurance proceeds by mail, which Karen was still obtaining in 1997. As a result, the crime was not complete immediately prior to or after Danny's death in 1992 as appellants allege, but rather after Karen obtained the last payment from Danny's life insurance policies in 1997.

Because the murder-for-hire crime was not completed prior to the amendment going into effect on September 13, 1994, there is no ex post facto violation. See Munger v. Erickson, 979 F.2d 1323, 1325 (8th Cir. 1992) ("A law violates the ex post facto clause if it applies to events occurring before its enactment[.]" (citations omitted)). The charges against appellants are not barred because no statute of limitations applies to this crime, which was completed in 1997 and resulted in death. Thus, the district court did not err in denying appellants' motions to dismiss count two.

Count one of the second superseding indictment charges conspiracy to commit murder-for-hire. "In a conspiracy charge, the limitations period begins to run from the occurrence of the last overt act committed in furtherance of the conspiracy that is set forth in the indictment." United States v. Dolan, 120 F.3d 856, 864 (8th Cir. 1997) (citations omitted). Count one alleges numerous overt acts involving the use of mail or facilities of interstate commerce that occurred after September 13, 1994, including, among other acts, that Karen withdrew $2,000 from her Lemay Bank and Trust Company account and paid an individual on behalf of Larry on October 16, 1994. Additionally, during trial, both appellants stipulated that Karen received some of Danny's life insurance benefits through the mails and various interstate commerce

facilities in May and July of 1997 and deposited those proceeds into a bank. The use of interstate commerce facilities, such as the mail, is an overt act in furtherance of a conspiracy to commit murder-for-hire. Because some of appellants' acts involved interstate commerce facilities that occurred after September 13, 1994, there is no ex post facto clause violation. Thus, the trial court did not err in denying appellants' motions to dismiss count one.

The government concedes, however, that the trial court should have instructed the jury to only consider the use of the mails or of interstate commerce facilities occurring on or after September 13, 1994. But the government argues that this error was harmless.

The harmless-error analysis applies "to cases involving improper [jury] instructions on a single element of the offense." Neder v. United States, 527 U.S. 1, 11 (1999). Errors that are harmless beyond a reasonable doubt are disregarded. Id. at 8. If the defendant admitted the element on which the jury was improperly instructed, then the error is harmless. Id. at 13.

During trial, appellants stipulated that mails and other interstate commerce facilities were used to secure Danny's insurance policies' proceeds in May and July of 1997. This evidence was sufficient to prove beyond a reasonable doubt the interstate facilities element of a murder-for-hire charge. Thus, any error by the trial court in omitting from the jury instructions that the jury should only consider appellants' use of the mails or interstate commerce facilities that occurred after September 13, 1994, is harmless.

B.    Severance

Appellants also argue that the trial court erred in denying their motions for severance. "A denial of a motion to sever will not be reversed unless clear prejudice

and an abuse of discretion are shown." United States v. Pherigo, 327 F.3d 690, 693 (8th Cir. 2003). "Generally, persons charged in a conspiracy should be tried together, especially when proof of the charges against the defendants is based upon the same evidence and acts." United States v. Arenal, 768 F.2d 263, 267-68 (8th Cir. 1985). Nonetheless, "[a] defendant can demonstrate real prejudice to his right to a fair trial by showing (a) his defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants." United States v. Washington, 318 F.3d 845, 858 (8th Cir. 2003) (citation omitted). Neither appellant argues that their defenses were irreconcilable as to any of the charged crimes. Appellants must therefore show that the jury was unable to compartmentalize the evidence in arriving at the verdict. See id. at 858.

Because the murder-for-hire and the conspiracy to commit murder-for-hire charges were identical to both appellants, severance is unnecessary. See, e.g., United States v. Donnell, 596 F.3d 913, 923 (8th Cir. 2010) (reasoning that there is a preference to try " 'persons charged in a conspiracy or jointly indicted on similar evidence from the same or related events should be tried together.' " (quoting United States v. Adkins, 842 F.2d 210, 211 (8th Cir. 1988))). And it does not matter that Mueller was not charged with obstruction of justice because the obstruction of justice charge was factually interrelated to the conspiracy to commit murder-for-hire and murder-for-hire charges. See United States v. Darden, 70 F.3d 1507, 1526-27 (8th Cir. 1995) (" '[I]t is not necessary that every defendant have participated in or be charged with each offense.' " (quoting United States v. Jones, 880 F.2d 55, 62-63 (8th Cir. 1989))).

After reviewing the record, we find that the evidence and jury instructions in this case were no more complex than those generally associated with trials involving two defendants. The properly joined trial gave "the jury the best perspective on all of the evidence[.]" Darden, 70 F.3d at 1528 (internal quotations and citations omitted). The jury was able to compartmentalize the evidence and follow the trial court's

instructions on how to consider the evidence. Thus, appellants have failed to demonstrate any real prejudice stemming from the trial court's denial of their motions for severance.

## III.    The Remaining Issue Raised by Kornhardt

Kornhardt argues that the trial court erred in denying his motion for a mistrial. According to Kornhardt, his confrontation clause rights as recognized in Bruton v. United States, 391 U.S. 123 (1968), were violated when Mueller's statements about the phone conversation between Mueller and him were admitted into evidence.

"In Bruton, the Supreme Court held that the admission of a nontestifying defendant's statement [facially] inculpating a codefendant violates the codefendant's Confrontation Clause rights, notwithstanding a curative instruction." United States v. Lewis, 557 F.3d 601, 611 (8th Cir. 2009). There is no confrontation clause violation when "the defendant's name and existence are excised from the statement and limiting instructions are given, even though the confession might implicate the defendant when linked to other evidence." United States v. Williams, 429 F.3d 767, 772-73 (8th Cir. 2005) (citation omitted). Obvious redactions, however, such as substituting a defendant's name with a "blank space" or the word "deleted" can also violate the confrontation clause. See Gray v. Maryland, 523 U.S. 185, 192 (1998) ("[W]e believe that, considered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to Bruton's unredacted confessions as to warrant the same legal results."). "To determine whether a statement violates Bruton, we must 'look[] at whether the context is one in which the risk is too great that the jury will not or cannot follow the cautionary instruction to consider the statement solely against the declarant.' " United States v. Sandstrom, 594 F.3d 634, 648 (8th Cir. 2010) (alteration in original) (quoting Williams, 429 F.3d at 773).

There are two sets of statements at issue: (1) Mueller's confession to an ATF agent after Mueller was identified as the other individual on the recorded phone call; and (2) Mueller's grand jury testimony about the phone conversation. We must view the redacted statements in isolation from the other evidence in order to determine whether the out-of-court statements violate Kornhardt's confrontation clause rights. See United States v. Logan, 210 F.3d 820, 822 (8th Cir. 2000) ("[T]he admissibility of a confession under Bruton is to be determined by viewing the redacted confession in isolation from the other evidence admitted at trial[.]").

## A.    Mueller's Confession to the Agent about the Phone Call

The agent testified that after Mueller was identified as the other person on the recorded telephone call, he confronted Mueller, who admitted to removing a firearm, ammunition, and a silencer from certain areas of a house and detached garage. The agent said that Mueller admitted to throwing a homemade silencer, a revolver, and a box of .38 ammunition in the river.

The agent's testimony made no specific reference to Kornhardt and did not suggest, on its own, that Kornhardt had anything to do with Mueller's confession in relation to the phone conversation. The trial court instructed the jury that the agent's testimony was to be considered only for purposes of determining whether Mueller was guilty of the murder-for-hire and conspiracy to commit murder-for-hire charges.

When viewed in isolation, we do not believe that this testimony impermissibly suggested to the jury that Kornhardt was the "individual" mentioned by the investigator. Thus, the admission of this testimony did not violate Kornhardt's confrontation clause rights as recognized in Bruton. See Logan, 210 F.3d at 822 (recognizing that the jury is presumed to follow the trial court's limiting instructions when the testimony "itself does not implicate the defendant").

## B.     Mueller's Grand Jury Testimony

Mueller's grand jury testimony was admitted during trial after being altered to replace Kornhardt's name with variations of "the individual" in approximately 43 instances. These facts are similar to the facts in United States v. Williams, 429 F.3d 767, 773 (8th Cir. 2005), where the defendant's name was replaced in 40 instances with the word "someone" in a manner that made it obvious that a name had been redacted. While we observed in Williams that "this case may fall within the Bruton class of cases where a district court's repeated cautionary instructions cannot protect the defendant," id. at 774, the court did not decide that issue because it found the error was harmless. Similarly, here, we need not decide the Bruton issue because, assuming that a confrontation clause error occurred, the independent evidence against Kornhardt on all three charges establishes that any error was harmless beyond a reasonable doubt. See United States v. Chapman, 345 F.3d 630, 635 (8th Cir. 2003) (a stricter standard of harmless beyond a reasonable doubt applies to confrontation right error).

A harmless-error analysis in the context of a confrontation clause violation requires us to "examine the other evidence adduced at trial and determine whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. at 1164 (citing Lufkins v. Leapley, 965 F.2d 1477, 1481 (8th Cir. 1992)). Several factors are considered under this analysis: "(1) the importance of the witness's testimony to the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of corroborating or contradicting testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case." Id. (citation omitted).

### 1. Murder-for-Hire Charge and Related Conspiracy Charge

As to the murder-for-hire and conspiracy to commit murder-for-hire charges, the evidence against Kornhardt was overwhelming. Karen testified about Kornhardt's involvement in Danny's murder, including the discussions before Danny's death and the payments received after Danny's death. Kempker also testified about Kornhardt's involvement before Danny's death. There was also the recorded phone conversation where Kornhardt told Mueller to immediately remove several hidden items from the house shortly after Kornhardt was arrested for Danny's death. Cf. United States v. Bolzer, 367 F.3d 1032, 1037 (8th Cir. 2004) ("The reference to destruction of evidence . . . was a permissible inference that could be drawn from the evidence the government ultimately produced in the case." (citations omitted)). Similarly, Kornhardt's recorded statements to his brother where he "[s]aid it doesn't look good for me" support the jury's verdict as well. Appellee App. at 9. Finally, the presence of Kornhardt's fingerprint on the new box of matches found near Danny's burned body is a particularly strong piece of evidence.

When considering all of the other evidence supporting the government's case against Kornhardt with regard to the murder-for-hire and conspiracy to commit murder-for-hire charges, Mueller's grand jury statements are insignificant. The overall strength of the government's case was very strong. Thus, the government has established beyond a reasonable doubt that any error in admitting Mueller's out-of-court statements to the grand jury was harmless.

### 2. Obstruction of Justice Charge

With regard to the obstruction of justice charge, the other evidence clearly establishes beyond a reasonable doubt that any error in admitting Mueller's grand jury statements was also harmless. Shortly after being arrested for Danny's death, Kornhardt called Mueller. During the phone conversation, which the jury properly

heard, Kornhardt ordered Mueller to immediately remove several items that were hidden throughout his house and detached garage. Kornhardt's wife initially answered the phone and remained in the house during the phone conversation. She identified Kornhardt and Mueller as the speakers in the recorded conversation. She also testified that she expected the police to search the house. The recorded phone conversation significantly reduced the importance of Mueller's grand jury testimony because Mueller's grand jury testimony was largely cumulative of the phone conversation. When viewed collectively, the other evidence against Kornhardt as to the obstruction of justice charge was strong.

We have reviewed the record in accordance with the factors set forth in Chapman. The phone conversation and the testimony of Kornhardt's wife established beyond a reasonable doubt that Kornhardt called Mueller and ordered him to immediately remove from the house incriminating evidence related to Danny's murder before the police discovered the evidence during a search. Thus, any error in admitting the grand jury testimony into evidence was harmless.

## IV.  The Remaining Issues Raised by Mueller

### A.  Failure to State an Offense

Mueller argues that the trial court erred in denying his motion to dismiss the indictment because it failed to state an offense against the United States. We review de novo the district court's denial of a motion to dismiss the indictment. United States v. Sewell, 513 F.3d 820, 821 (8th Cir. 2008) (citation omitted).

Mueller argues that the murder-for-hire charge and the related conspiracy charge fail to allege the actual interstate use of an interstate commerce facility as required by 18 U.S.C. § 1958(a) prior to its 2004 amendment. According to Mueller, the pre-2004 language, "to use the mail or any facility in interstate commerce,"

required the indictment to allege that the interstate commerce facility usage involved multiple states.[3] This court rejected this same argument in United States v. Howard, 540 F.3d 905 (8th Cir. 2008), when we interpreted the statute's pre-amendment language as covering interstate financial facility usage that was entirely intrastate. Id. at 908 ("The difference in language does not alter the essential elements of the charge because the phrase 'to use the mail or any facility *in* interstate commerce' includes the intrastate use of facilities *of* interstate commerce."). This panel is bound by the holding in Howard. United States v. Franklin, 250 F.3d 653, 665 (8th Cir. 2001) ("It is well established, however, that one panel of this Court may not overrule another and so we must decline Appellant's invitation to reconsider our prior decision." (citation omitted)). Thus, the district court did not err in denying the motion to dismiss the indictment.

## B.     Prosecutorial Misconduct

Mueller argues that the prosecutor's remarks made during closing argument constitute prosecutorial misconduct. Mueller did not object to the comments at the time they were made. "[T]herefore, we review under the plain-error standard and will reverse only 'if there is 1) error 2) that is plain and 3) affects the defendant's substantial rights.' " Hance, 501 F.3d at 908 (quoting United States v. Robinson, 439 F.3d 777, 780 (8th Cir. 2006)). "To obtain a reversal for prosecutorial misconduct, the defendant must show that (1) the prosecutor's remarks were improper, and (2) such remarks prejudiced the defendant's rights in obtaining a fair trial." Id. at 780 (internal quotations and citation omitted). "If we reach the second step, we consider: (1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of [Defendant's] guilt; and (3) the curative actions taken by the trial court."

---

[3] In 2004, the statute was amended in relevant part by changing "any facility in interstate commerce" to "any facility of interstate commerce." *See* 18 U.S.C. § 1958(a).

United States v. Cannon, 88 F.3d 1495, 1502 (8th Cir. 1996), abrogated on other grounds by Watson v. United States, 552 U.S. 74 (2007).

There are two specific statements made by the prosecutor that are alleged to constitute plain error. The first involved the following objection by the prosecutor: "Your Honor, I'm going to object to that. We got ethical problems here. I don't know why you'd get into that." Docket 300 at 118. Shortly thereafter, the prosecutor made the following statement at the beginning of the prosecution's rebuttal argument: "Ladies and gentlemen, after listening to these two arguments, it amazes me that either one of these attorneys have the gall to criticize witnesses." Docket 300 at 121.

The prosecutor's objection and beginning statement in his rebuttal was in response to Mueller's argument that "[t]he government rejected, rejected [Mueller] as a witness in this case. They rejected his story." Docket 300 at 118. The prosecutor's objection was in response to Mueller's argument that the government did not believe Mueller's story because the government did not call Mueller to testify as a witness at trial. Mueller's Fifth Amendment right against self-incrimination precluded the government from forcing Mueller to be a witness against himself. Similarly, the prosecutor's statement in rebuttal was in response to appellants' arguments that the witnesses who testified at the trial were not credible. Understood in this context, we cannot say that the prosecutor's objection and statement in rebuttal constituted plain error.

Moreover, Mueller has failed to demonstrate that the prosecutor's statements deprived him of a fair trial. The objection and the opening rebuttal statement were very brief and played a minuscule role in the context of the case against Mueller. The evidence against Mueller was strong. Finally, the jury was repeatedly instructed by the trial court that the attorneys' objections and closing arguments were not evidence. Thus, Mueller has failed to demonstrate that the alleged plain error affected his substantial rights.

-17-

## C.     Competent to Stand Trial

Two weeks before the scheduled trial date, Mueller's attorney moved under 18 U.S.C. § 4241(a) for a determination of Mueller's mental condition. The trial court conducted a hearing shortly after Mueller's motion and ordered an examination to assist in an initial determination of whether Mueller was competent to stand trial. In response to the court's order, Dr. Kline, a licensed psychologist who examined Mueller, submitted a report finding that Mueller was competent to stand trial. Mueller objected to Dr. Kline's report and requested a continuance for purposes of obtaining an additional examination.

In response to Mueller's objections to the report, the trial court held another hearing for purposes of determining the nature and extent of Mueller's objections. Dr. Kline was present at the hearing. The trial court refused Mueller's request to question Dr. Kline about how he arrived at the conclusions stated in his report because of the trial court's limited resources, including time. Mueller's request for another evaluation was also denied. The trial court found that Mueller was competent to stand trial. Mueller argues that the trial court's determination was in error.

"A defendant has a due process right not to be convicted while incompetent and to have his competence determined in an evidentiary hearing." United States v. Long Crow, 37 F.3d 1319, 1325 (8th Cir. 1994) (citations omitted). "The burden rests with the defendant to demonstrate that he was not competent to stand trial[.]" United States v. Denton, 434 F.3d 1104, 1112 (8th Cir. 2006) (citation omitted). "Determining whether a defendant is competent to stand trial is committed to the discretion of the district court." United States v. Ghane, 490 F.3d 1036, 1040 (8th Cir. 2007) (citing United States v. Denton, 434 F.3d 1104, 1112 (8th Cir. 2006)). The trial court's determination is reviewed for clear error. Denton, 434 F.3d at 1112.

Dr. Kline's report expressed the opinion that Mueller was competent to stand trial. A " 'medical opinion on the mental competency of an accused is usually persuasive evidence on the question of whether a sufficient doubt exists [about the defendant's competence].' " Long Crow, 37 F.3d at 1325 (quoting Griffin v. Lockhart, 935 F.2d 926, 930 (8th Cir. 1991)) (other citations omitted). We have reviewed Dr. Kline's report and find that his explanation and rationale supporting his conclusion is more than sufficient to uphold the trial court's finding that Mueller was competent to stand trial. See United States v. Ghane, 593 F.3d 775, 781 (8th Cir. 2010) ("[I]n crediting an expert's opinion, it is not the opinion itself that is important, but the rationale underlying it."). Thus, we affirm the trial court's finding that Mueller was competent to stand trial.

### D.    Competency Hearing

Mueller also argues that the trial court violated his due process right by failing to allow him the opportunity to ask questions of the examining psychologist, denying his request for a second opinion, and failing to adequately inquire into his competency.

"Under 18 U.S.C. § 4241(a), a district court is required to grant a motion requesting a competency hearing when 'there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.' " United States v. Whittington, 586 F.3d 613, 618 (8th Cir. 2009). "Decisions regarding competency hearings are factual findings that we will affirm unless clearly arbitrary or unwarranted, or clearly erroneous." United States v. Minnis, 489 F.3d 325, 329 (8th Cir. 2007) (internal quotations and citations omitted).

The trial court conducted multiple hearings, ordered a psychological examination, and considered Dr. Kline's rationale and explanations. Based on this record, we find unpersuasive Mueller's argument that the trial court failed to adequately inquire into his competency. We also cannot say that the trial court clearly erred in denying Mueller's requests to cross-examine Dr. Kline or for a second opinion. Cf. United States v. Jones, 23 F.3d 1307, 1309 (8th Cir. 1994) (Morris Sheppard Arnold, J., plurality) (recognizing that a "trial court ha[s] the discretion to hold or to forgo an additional hearing" when "[t]he psychiatric report submitted to the court indicate[s] that [the defendant] was competent to stand trial"); id. at 1316 (Wellford, J., concurring in result) ("It is clear in this circuit that once a defendant has been determined to be competent to stand trial, a hearing on competency is not required." (citation omitted)). See also United States v. Lebron, 76 F.3d 29, 32 (1st Cir. 1996) ("If a psychiatrist has determined that a defendant is competent, a court is not required to hold a further evidentiary hearing absent extenuating circumstances."). Moreover, even if the trial court committed a procedural error during the second hearing, we find that the error was harmless because Mueller was competent to stand trial as explained above. See United States v. Huguenin, 950 F.2d 23, 28 (1st Cir. 1991) ("[P]rocedural glitches during the competency determination may be deemed harmless error where there is no reasonable probability that different procedures would have produced a finding of incompetency." (citing United States ex rel. Lewis v. Lane, 822 F.2d 703, 706 (7th Cir. 1987)) (other citations omitted).

### E.    Sufficiency of the Evidence

Finally, Mueller argues that there was insufficient evidence to support the jury's verdict. " 'We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict.' " United States v. May, 476 F.3d 638, 640-41 (8th Cir. 2007) (quoting United States v. Washington, 318 F.3d 845, 852 (8th Cir. 2003)). "We may reverse

only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt." Id. (internal quotations and citation omitted).

Mueller repeatedly confessed to being involved in Danny's murder. He identified the location of the murder scene, which was in the basement of a house that was previously unknown to the agents. He also told agents about his role in the murder. In the presence of the agents, he reenacted the events leading up to Danny's death inside the house. And he told an agent during an interview that he was paid for his role in the murder.

After reviewing the record, we find that a jury could conclude that Mueller was guilty of conspiracy to commit murder-for-hire and murder-for-hire beyond a reasonable doubt. Thus, there was sufficient evidence to convict Mueller of the crimes charged against him. We therefore affirm on all accounts.

_____