# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 24-3389

———————————————

United States of America

*Plaintiff - Appellee*

v.

Raymond Tetzlaff

*Defendant - Appellant*

——————————

Appeal from United States District Court
for the Eastern District of Arkansas - Delta

——————————

Submitted: November 20, 2025
Filed: May 13, 2026

——————————

Before COLLOTON, Chief Judge, SHEPHERD and ERICKSON, Circuit Judges.

——————————

SHEPHERD, Circuit Judge.

Raymond Teztlaff was convicted of one count of assault causing serious bodily injury stemming from an altercation with another prison inmate, after which the district court[1] sentenced him to 120 months' imprisonment followed by 3 years

———

[1]The Honorable James M. Moody, Jr., United States District Judge for the Eastern District of Arkansas.

of supervised release, with the term of imprisonment running consecutively to an undischarged term of imprisonment for another federal offense. Tetzlaff appeals both his conviction and sentence, asserting that the evidence was insufficient to support his conviction; that the district court erroneously limited Tetzlaff's ability to cross examine a witness; that the Government made improper and prejudicial comments during trial, which deprived him of a fair trial; and that the district court improperly applied a seven-level sentencing enhancement. Having jurisdiction under 28 U.S.C. § 1291, we affirm in full.

I.

"We recite the facts in the light most favorable to the jury's verdict." United States v. Galloway, 917 F.3d 631, 632 (8th Cir. 2019) (citation omitted). Raymond Tetzlaff was indicted on one count of manslaughter, in violation of 18 U.S.C. § 1112, and one count of assault causing serious bodily injury, in violation of 18 U.S.C. § 113(a)(6), related to an incident that occurred while he was a federal inmate housed at the Forrest City Federal Correctional Complex. Another inmate, Mack Bowens, testified that he observed an argument between Tetzlaff and a third inmate, Ben McGraw, with Tetzlaff accusing McGraw of stealing a contraband cell phone that belonged to Tetzlaff. Bowens saw Tetzlaff sucker punch McGraw in the head, and McGraw fall to the floor, where he lay, bleeding from the head and unmoving for five to six minutes. Later, Tetzlaff's cellmate, Ronald Haas, saw McGraw sitting in a chair with a towel over his head and staring at the floor. Haas also observed a deep gash on the back of McGraw's head. Further, Haas testified that Tetzlaff told Haas that he had "dropped" McGraw, and that McGraw was unconscious for over eleven minutes. Haas also overheard Tetzlaff telling another inmate about the incident, and, when referring to his punch of McGraw, stating that "it works every time."

McGraw's cellmate, Michael Rimlawi, who had been a physician prior to his incarceration, testified that, shortly after the altercation, he checked on McGraw and noticed immediately that "something wasn't right." Rimlawi explained that he observed a three- to four-inch-long laceration on the back of McGraw's head that

was half an inch wide.  Rimlawi testified that, based on the severity of the injury, he told McGraw to seek medical care and that he heard Tetzlaff tell McGraw to say he fell in the shower if asked about the cause of his injuries.  Rimlawi also testified that he asked Tetzlaff what was going on, and Tetzlaff responded, "I knocked his ass out," and "I hit him right in the button."

Other inmates ultimately helped McGraw get back into his bunk.  Later that afternoon, roughly two hours after corrections officers performed a regular count of the inmates and noticed nothing amiss, McGraw fell out of his bunk.  Inmates observed McGraw lying on the floor with a pool of blood under his head, convulsing.  Inmates notified the correctional officer on duty, Caleb Downing, that an inmate needed medical assistance.  Downing responded immediately and, when he arrived on the scene, he observed McGraw "laying on the ground having a seizure-like symptom and bleeding on his head."  Downing called for a medical response, and paramedics ultimately transported McGraw to the hospital, where McGraw died from his injuries.

McGraw's autopsy revealed that his cause of death was blunt force injury to the head, with a medical examiner from the Arkansas State Crime Laboratory testifying that the manner of death was classified as homicide.  The medical examiner testified that McGraw had a laceration on the back of his head, and it bore signs of early healing, suggesting that it had occurred before McGraw died.  The medical examiner observed no other lacerations on McGraw's head, and explained that McGraw had sustained a skull fracture, a brain contusion, and bleeding, consistent with the skull fracture.  She also testified that the injury was consistent with a backwards fall and was likely caused by a single event. Finally, she explained that someone suffering a serious injury from blunt force trauma to the head could experience a lucid interval and not understand the severity of the injury until swelling reaches a point where it causes more severe symptoms.

During opening statements, the Assistant United States Attorney referenced the fact that "this is a prison trial." Expounding on that statement, the AUSA explained,

> [T]his is a crime that occurred behind the prison walls. So it's different. Your witnesses are different. . . . And you will also learn from the prisoners that, you know what, there's a prison code. Don't get involved. Don't talk, don't snitch, don't be a rat. You will hear all of that and how the pressures of that and how much more it is when you're talking about an assault and a homicide.

The AUSA also made statements about the credibility of witnesses, specifically stating that Bowens, the eyewitness to the altercation between Tetzlaff and McGraw, "will testify truthfully. I'll submit to you when you hear him you will see that he's telling the truth. And he's always told the truth about what happened to Ben McGraw." Similarly, the AUSA stated that Tetzlaff's cellmate, Ronald Haas, would testify and that "[h]e has concerns, but he wants to tell the truth." Tetzlaff did not object to any of these statements.

During his direct examination of Bowens, the AUSA questioned him about his incarceration and his offenses of conviction. Bowens explained that he had been incarcerated for over 24 years for three convictions for drug distribution and one conviction for obstruction of justice, "meaning [Bowens] had a witness . . . sign a false document." Bowens also testified that he had "[a] few years and a couple months" left on his sentence, and that he had not been offered or asked for anything from the Government in exchange for his testimony. During cross-examination, Tetzlaff's counsel also questioned Bowens about his criminal history. After Bowens admitted that he was incarcerated for three controlled substance distribution convictions, Tetzlaff's counsel attempted to ask Bowens about an incident where Bowens allegedly "took a gentleman in the woods and put a gun to his head and told him he better not snitch on [him]." The Government immediately objected, asserting that this was improper impeachment. The district court sustained the Government's objection, concluding that Tetzlaff's counsel's line of questioning "ha[d] nothing to

do with anything you're trying to impeach him with." The district court similarly precluded Tetzlaff's counsel from questioning Bowens about purportedly false affidavits he filed in a case before the Fifth Circuit Court of Appeals, concluding that it was "too far afield" to be used for proper impeachment purposes.

At the close of the Government's case, Tetzlaff moved for a judgment of acquittal, asserting that the evidence was insufficient to convict Tetzlaff on either the manslaughter or assault charges. The district court denied the motion, concluding that there was sufficient evidence for the jury to determine whether the injuries McGraw sustained stemmed from a punch or from a fall from the bed.

During closing, the AUSA made several statements about the testimony the jury heard, including:

> Ladies and gentlemen, it all came to you and this is really important, from multiple sources, from different angles. I mean, and that's what makes you know the truth of a situation because one guy says this and one guy says this and one guy says this and one guy saw this. It all points in the direction that he's guilty, that he did this. That's what you have in this case. Mack Bowens is not going to lie on the stand. I submit to you that his evidence that shows that he was telling the truth and you can judge his credibility . . . .

The AUSA also stated that its witnesses were "telling you the truth, the whole truth, and they're not embellishing, they're not making it up. They have nothing to gain by doing that"; opined that Tetzlaff's theory that McGraw suffered injuries from the fall from his bunk and not from an assault was "pure speculation, not a bit of evidence in support of that"; and stated that, to believe Tetzlaff's version of events "is to say that all those people [who told a contrary story] got up there under all that pressure and then also committed perjury." Finally, the AUSA specifically focused on the victim in asking the jury to convict Tetzlaff:

> Ben McGraw wanted to serve his time and go home. He can't. He never will. And he never will because of the actions of that man. He's

not going to go home because Raymond Tetzlaff punched him in the face, knocked him out cold, and cracked his skull. Ben McGraw will never go home. In the American justice system, we ensure justice for all. Equal justice for everybody. It doesn't matter what that person has done or where he is, in America we get justice for all. Benjamin McGraw and his family deserve justice. In this case, what is justice? It is a guilty verdict convicting Raymond Tetzlaff of voluntary manslaughter and of assault that resulted in serious bodily injury.

Again, Tetzlaff did not object to any of these statements.

The jury ultimately returned a guilty verdict as to the assault causing serious bodily injury charge, but deadlocked as to the manslaughter count.[2] The United States Probation Office prepared a Presentence Investigation Report (PSR), which calculated Tetzlaff's United States Sentencing Guidelines (USSG) range at 46 to 57 months' imprisonment. This calculation included a seven-level enhancement to the base offense level, pursuant to USSG § 2A2.2(b)(3)(C), because the victim of the offense sustained permanent or life-threatening bodily injury. Tetzlaff objected to this enhancement, asserting that because he was not convicted of manslaughter and was convicted only of assault causing serious bodily injury, the appropriate enhancement was a five-level enhancement, pursuant to USSG § 2A2.2(b)(3)(B), that applied where the victim sustained serious bodily injury. The district court overruled the objection. The district court ultimately found that the Guidelines range was 46 to 57 months, but varied upward and imposed a sentence of 120 months' imprisonment, ordering Tetzlaff's sentence to be served consecutively to the sentence he was already serving in federal prison. This appeal follows.

---

[2]The district court declared a mistrial on the manslaughter count, and after the district court sentenced Tetzlaff on the assault count, the Government filed a motion to dismiss the manslaughter count, which the district court granted.

## II.

Tetzlaff first asserts that the district court erred in denying his motion for a judgment of acquittal based on insufficiency of the evidence, asserting that the Government failed to prove that Tetzlaff assaulted McGraw, and, even if it did sufficiently prove Tetzlaff assaulted McGraw, it failed to prove beyond a reasonable doubt that the assault caused McGraw's ultimately fatal injuries. "'We review the denial of a motion for judgment of acquittal *de novo*, viewing the evidence and all reasonable inferences in the light most favorable to the jury's verdict.' 'We will direct a judgment of acquittal only when no reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" United States v. Plume, 110 F.4th 1130, 1133 (8th Cir. 2024) (citations omitted).

To sustain a conviction under 18 U.S.C. § 113(a)(6), the Government must prove, beyond a reasonable doubt, "(1) an intentional assault of another person (2) who suffered serious bodily injury (3) within the special maritime and territorial jurisdiction of the United States." United States v. Love, 20 F.4th 407, 409-10 (8th Cir. 2021). Serious bodily injury means "bodily injury which involves—(A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty." 18 U.S.C. § 1365(h)(3); 18 U.S.C. § 113(b)(2) (incorporating the definition of "serious bodily injury" in § 1365 into § 113).

Tetzlaff first asserts that the evidence was insufficient to demonstrate that he assaulted McGraw. Specifically, Tetzlaff asserts that he introduced evidence that there were no signs of trauma either to his hands or McGraw's face that would have supported the contention that Tetzlaff punched McGraw in the face. Tetzlaff asserts that this evidence, coupled with the undisputed fact that McGraw fell from his bunk and hit his head, means a reasonable juror could not conclude beyond a reasonable doubt that Tetzlaff assaulted McGraw. We disagree. The jury heard evidence from which it could have concluded, beyond a reasonable doubt, that Tetzlaff assaulted McGraw. The jury heard testimony from Bowens that he saw Tetzlaff punch

McGraw, which was corroborated by both Haas and Rimlawi, who testified that Tetzlaff admitted to punching McGraw. Further, the jury heard testimony that McGraw suffered a deep laceration to his head during the confrontation with Tetzlaff, that McGraw was acting strangely shortly after the encounter, and that Tetzlaff told McGraw that if he were to seek medical attention, he should report that he suffered his injuries from falling in the shower. Tetzlaff was free to argue, as he did, that the injuries to McGraw came from an accidental fall from his bunk and that no violent confrontation between the two occurred. But the jury was tasked with weighing the testimony and making credibility determinations in determining which theory of the case to credit. Tetzlaff merely disagrees with the conclusions the jury reached, and we will not disturb the jury's findings on this basis. See United States v. Mann, 701 F.3d 274, 298 (8th Cir. 2012) ("'It is the function of the jury, not an appellate court, to resolve conflicts in testimony or judge the credibility of witnesses.' 'Such credibility findings are "virtually unreviewable on appeal."'" (citations omitted)). Sufficient evidence supported the jury's conclusion that Tetzlaff assaulted McGraw, and the district court thus did not err in denying the motion for judgment of acquittal on this basis.

Tetzlaff next asserts that the Government failed to prove that McGraw suffered a serious bodily injury. According to Tetzlaff, because McGraw appeared to be fine following the altercation with Tetzlaff, the jury could not have found beyond a reasonable doubt that McGraw suffered serious bodily injury. Again, we disagree. The jury heard evidence from which it could conclude, beyond a reasonable doubt, that McGraw suffered a serious bodily injury from Tetzlaff's punch. This includes testimony from inmates that McGraw lost consciousness after the punch, that McGraw was not acting normally after the fight, and that inmates observed a large laceration on McGraw's head. Further, the medical examiner testified that McGraw's laceration showed early signs of healing, indicating that it was inflicted before McGraw died, and that it was possible for someone suffering from a serious blunt force injury to the head to have a lucid interval before symptoms become more severe. Again, Tetzlaff's argument is nothing more than a contention that the jury should have credited his theory—that McGraw's serious bodily injury

came from the fall from his bunk and not from Tetzlaff's assault—which does not suffice. See United States v. Serrano-Lopez, 366 F.3d 628, 634 (8th Cir. 2004) ("'If the evidence rationally supports two conflicting hypotheses, the reviewing court will not disturb the conviction.' '[To secure a guilty verdict, t]he government[] . . . "need not exclude every reasonable hypothesis of innocence."'" (citations omitted)). We conclude that sufficient evidence supported the jury's conclusion that McGraw suffered a serious bodily injury. The district court did not err in denying Tetzlaff's motion for judgment of acquittal on this basis.

III.

Tetzlaff next challenges the district court's decision to limit his cross-examination of Bowens, which he asserts violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. Tetzlaff asserts that questioning Bowens about the background and context of his conviction would have been highly relevant to Bowens's credibility, which the district court failed to properly consider. Tetzlaff also asserts that questions about the purportedly false affidavits were highly relevant to Bowens's credibility. "Generally, preserved evidentiary challenges are reviewed under the [deferential] abuse of discretion standard." United States v. Arias, 74 F.4th 544, 550 (8th Cir. 2023). However, where, as here, "the challenge implicates a constitutional right, our review is *de novo*." Id.

"The Confrontation Clause provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' Although the Sixth Amendment guarantees a defendant an opportunity for effective cross-examination of witnesses, that right is not unfettered." United States v. Maloney, 102 F.4th 904, 912-13 (8th Cir. 2024) (alteration in original) (citation omitted). "A defendant establishes a violation of his confrontation clause rights by showing 'that he was prevented from exposing facts to the jury from which they could reasonably make inferences about the reliability of the witness.' A violation of a defendant's right to confrontation is subject to harmless error review." Arias,

74 F.4th at 550 (citation omitted). "A harmless-error analysis in the context of a confrontation clause violation requires us to 'examine the other evidence adduced at trial and determine whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" United States v. Mueller, 661 F.3d 338, 349 (8th Cir. 2011) (citation omitted). We consider several factors in conducting this analysis, consisting of: "(1) the importance of the witness's testimony to the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of corroborating or contradicting testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case." Id. at 350 (citation omitted).

Here, the district court's limitations on Tetzlaff's cross-examination of Bowens did not prevent Tetzlaff from exposing facts to the jury that would have allowed it to make inferences about Bowens's credibility. Importantly, the district court permitted Tetzlaff to conduct a robust cross-examination of Bowens, including allowing Tetzlaff to question Bowens about his previous criminal history and any motivation he may have had for providing testimony in support of the Government. The district court allowed Tetzlaff to question Bowens specifically about the nature of his obstruction of justice conviction but merely limited questions as to the underlying facts. We conclude that these were "reasonable limits . . . on cross-examination" that do not run afoul of the Confrontation Clause. United States v. Clay, 883 F.3d 1056, 1061 (8th Cir. 2018) ("The district courts 'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" (citation omitted)). Tetzlaff thus fails to demonstrate that the district court improperly limited Tetzlaff's cross-examination of Bowens in violation of the Confrontation Clause. See United States v. Watson, 650 F.3d 1084, 1089 (8th Cir. 2011) ("'The main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination.*' '[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to

whatever extent, the defense might wish.'" (alteration in original) (citations omitted)). Further, even if an error occurred, we conclude that it was harmless beyond a reasonable doubt because Tetzlaff was able to otherwise challenge Bowens's credibility and his desired line of questioning would have been cumulative to Tetzlaff's other impeachment efforts, including questioning Bowens about his criminal history and motives for providing testimony in support of the Government. See United States v. Jones, 728 F.3d 763, 767 (8th Cir. 2013) ("Even if the district court erred in not allowing the question to [the witness] or the evidence of the judge's [credibility] finding, this court finds any error harmless beyond a reasonable doubt. [Defendant] examined [the witness] at length about his lack of credibility. Additional evidence would have been cumulative.").

IV.

Tetzlaff also asserts that the Government made improper and prejudicial comments during opening statements and closing argument, which deprived him of his right to a fair trial. "The test for reversible prosecutorial misconduct has two parts: (1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." United States v. Azure, 164 F.4th 688, 694 (8th Cir. 2026) (citation omitted). "To determine whether the defendant was deprived of a fair trial, we consider three factors: the cumulative effect of the misconduct, the strength of the properly admitted evidence, and any curative actions taken by the district court. 'The ultimate question is whether the prosecutor's comments, if improper, so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" United States v. Kopecky, 891 F.3d 340, 343 (8th Cir. 2018) (citation omitted). Because Tetzlaff failed to object to any of the statements at trial that he now challenges on appeal, our review is for plain error. United States v. McClellon, 578 F.3d 846, 859 (8th Cir. 2009). "To obtain relief, [Tetzlaff] must show that there was an error, that is plain, and that affected his substantial rights. If all three conditions are met, we may exercise our discretion to correct a forfeited error, but only if the error seriously affects the fairness,

integrity, or public reputation of judicial proceedings." United States v. Mullins, 446 F.3d 750, 758 (8th Cir. 2006). "An error affects a person's substantial rights if it is prejudicial, meaning there is a reasonable probability of a more favorable outcome had it not occurred." United States v. Shaw, 104 F.4th 691, 693 (8th Cir. 2024).

Tetzlaff first asserts that the Government's statements about the veracity of the prisoner witnesses' testimony amount to improper vouching. "Improper vouching may occur when the government refers to facts outside the record or implies that the veracity of a witness is supported by facts outside the record and unavailable to the jury." United States v. Atkins, 881 F.3d 621, 626 (8th Cir. 2018). "Although attempts to bolster a witness by vouching for his credibility are normally improper, the government may explain why the jury might find the government's witnesses credible." United States v. Sevilla-Acosta, 746 F.3d 900, 905 (8th Cir. 2014) (citation omitted). "No matter, however, '[t]he relevant question ultimately is whether the prosecutor's comments, if improper, "so infected the trial with unfairness as to make the resulting conviction a denial of due process."'" Atkins, 881 F.3d at 626 (alteration in original) (citation omitted). Even assuming without deciding that the Government's statements were improper, Tetzlaff cannot prevail because he cannot show that the comments affected his substantial rights. The Government's case was strong, with numerous eyewitnesses testifying about the incident between Tetzlaff and McGraw and expert testimony regarding the nature and source of McGraw's injuries. Given the overall strength of the Government's case, Tetzlaff has not demonstrated the reasonable probability of a different outcome of the trial but for the AUSA's statements. See United States v. Bentley, 561 F.3d 803, 811 (8th Cir. 2009) (finding no plain error where Government described defendant as a "sexual predator" because "[t]he evidence of [defendant's] guilt was strong, and there is no reasonable probability that the verdict would have changed without those remarks"). Tetzlaff thus cannot show that the district court plainly erred, and he is not entitled to relief on this claim.

Tetzlaff also argues that the Government improperly appealed to the passions of the jury by urging the jury to convict Tetzlaff because justice demanded it. We disagree. "[U]nless calculated to inflame, an appeal to the jury to act as the conscience of the community is not impermissible." United States v. Obi, 25 F.4th 574, 580 (8th Cir. 2022) (alteration in original) (citation omitted). Whether a statement is improper is a "fact-intensive inquiry" and requires us to consider whether the statement "in context, simply 'urge[s] a conclusion based on the evidence,'" which is permissible, or, whether it impermissibly "refer[s] to larger societal problems." Id. (citation omitted). Here, the Government's statements regarding justice were permissible because they were tied to the facts of the case: that Tetzlaff punched McGraw, knocked him out, and caused him to suffer a skull fracture and fatal brain bleeding. The Government's assertion that McGraw was entitled to justice for these injuries was not impermissible, and thus we find no error, let alone one that was plain in allowing the jury to hear these statements. See id. ("[T]he prosecutor's context was to argue that the four eyewitness victims who testified to the trauma [the defendant] inflicted deserved justice. This argument focused on the facts of the case; it was not an exceptional circumstance warranting a new trial on plain error review.").

V.

Finally, Tetzlaff asserts that the district court erred when it applied a seven-level sentencing enhancement pursuant to USSG § 2A2.2(b)(3)(C), which applies where the victim sustained a permanent or life-threatening injury, because it did so without making any findings to support § 2A2.2(b)(3)(C)'s application. "When reviewing the district court's calculation of the sentencing guidelines advisory sentencing range, '[w]e review the district court's factual findings for clear error and its construction and application of the Guidelines de novo.'" United States v. Beckman, 787 F.3d 466, 494 (8th Cir. 2015) (alteration in original) (citation omitted). But "[i]f a defendant fails to timely object to a procedural sentencing error, the error is forfeited and may only be reviewed for plain error." United States v. Timberlake, 679 F.3d 1008, 1011 (8th Cir. 2012) (alteration in original) (citation

omitted). While Tetzlaff objected at sentencing to receiving the seven-level enhancement over a five-level enhancement he believed applied, he did not make any objection regarding the district court's alleged failure to make findings supporting the seven-level enhancement. We thus review Tetzlaff's claim for plain error.

USSG § 2A2.2 provides a base offense level of 14 for a defendant convicted of assault causing serious bodily injury under 18 U.S.C. § 113(a)(6). However, the provision details that, where the bodily injury the victim sustained was permanent or life-threatening, the base offense level should be increased seven levels. USSG § 2A2.2(b)(3)(C). We disagree with Tetzlaff's contention that the district court lacked a sufficient basis to apply this enhancement. While the district court did not make express factual findings on the record at sentencing about the injury McGraw sustained, it was entitled to rely on record evidence to support the enhancement's application; a "district court need not detail its reasons for applying an enhancement when it is based on unobjected to facts in the presentence investigation report and *other record evidence*." United States v. Goldman, 447 F.3d 1094, 1096 (8th Cir. 2006) (emphasis added). The district court explicitly stated that McGraw's permanent or life-threatening bodily injury was "established by the record at trial," and that "the evidence was clear to [it] that not only a permanent injury was incurred as a result but the punch contributed to Mr. McGraw's death." This is sufficient to support the application of the enhancement. See United States v. Watkins, 91 F.4th 955, 962 (8th Cir. 2024) ("Despite the district court's lack of an affirmative finding that the gun facilitated [the defendant's] drug possession, the record supports such a finding, so there was no error in the district court's application of the four-level enhancement."). The district court did not err, much less plainly so, in applying the seven-level enhancement for an assault that resulted in permanent or life-threatening injuries.

## VI.

For the foregoing reasons, we affirm the judgment of the district court.

_____